UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVEN RAWLINS,                           :

      Petitioner/Movant,          :

v.                                        :     Case No. **19 CV 0135**

UNITED STATES OF AMERICA,                 :

      Respondent.                 :


### MOTION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

1.  The judgment being challenged was entered by the United States District Court for the Southern District of New York in Case Number 1:15-CR-00377-AJN.

2.  The date of the judgment of conviction was June 21, 2016, and the date of sentencing was June 21, 2016.

3.  The length of sentence was 108 months.

4.  The nature of the crime was one count of Wire Fraud in violation of 18 U.S.C. § 1343 and 2.

5.  Rawlins entered a not guilty plea.

6.  Rawlins went to trial by jury.

7.  Rawlins testified at trial.

8.  Rawlins filed an appeal from the judgment of conviction.

9.  Rawlins filed his appeal in the United States Court of Appeals for the Second Circuit, Docket Number 16-2074-cr.  The judgment was affirmed on August 22, 2017.  The issues raised was that the district court (1) abused its discretion in denying the

request to cross-examine Brian Sharp on his extra-marital affair;
(2) abused its discretion in denying the request to cross-examine
Brian Sharp on the details of the civil suit by Rawlins against
Prime Health Services; (3) violated Rawlins' right to a fair trial
by admitting uncharged crimes and bad acts as direct evidence; (4)
erred in finding the existence of an uncharged conspiracy, pretrial,
and then ruling that statements of Franklin Palm were admissible as
non-hearsay statements of a co-conspirator made during and in
furtherance of the conspiracy; (5) erred in its jury instructions
on Blackmail and an Authorization Defense; and (6) erred in increasing
offense level under the Sentencing Guidelines by four because it made
a clearly erroneous finding of fact that Rawlins employed sophisticated
means in the commission of his crime and obstructed justice.  Rawlins
did not file a petition for certiorari in the United States Supreme
Court.

10.   Rawlins has previously filed another motion concerning
the judgment of conviction.

11.   The previously filed motion was in the United States Court
of Appeals for the Second Circuit, Case Number 16-2074-cr.  The
motion filed was for Re-hearing pursuant to Rule 40 and 35.  The
issue raised was that the Court of Appeals misconstrued a material
fact and point of law when it found that the district court did not
abuse its discretion in denying the request to cross-examine Brian
Sharp on his extra-marital affair.  Rawlins did not receive a
hearing on this motion.  The Second Circuit denied the motion on
November 15, 2017.  No other motions have been filed.

12.   Rawlins alleges the grounds stated below, for which Rawlins claims he is being held in violation of the constitution, laws or treaties of the United States.  All facts alleged by Rawlins for one ground  are alleged in support of all other grounds, to the extent it is not inconsistent with the purposes of this petition, or any applicable law or rule.  Rawlins requests this Court follow the general rule that pro se motions be construed liberally, and be interpreted to encompass any legally valid ground for relief under 28 U.S.C. § 2255, regardless of the language employed.

## G R O U N D   1

**COUNSEL RENDERED INEFFECTIVE ASSISTANCE AND VIOLATED RAWLINS' RIGHT TO DUE PROCESS WHEN COUNSEL DEVELOPED A CONFLICT OF INTEREST SHORTLY BEFORE TRIAL THAT ADVERSELY AFFECTED HIS REPRESENTATION OF RAWLINS.**

<u>FACTS.</u>  Rawlins was charged in a One-Count Information with Wire Fraud for allegedly making illegal cash transfers from the Capital Bank accounts of Prime Health Services, Inc. and Core Choice, Inc. The majority stockholder of both companies, and the Government's key witness against Rawlins, was Brian Sharp.  Rawlins was a minority stockholder, owning 10% of Core Choice.  Rawlins claimed that he had authorization from Brian Sharp to make the cash transfers, and Sharp testified at trial that he had not authorized Rawlins to make the transfers, making the primary issue at trial the credibility of Brian Sharp and Rawlins.  Rawlins retained Richard Braun as Counsel to represent him.  The sole trial strategy discussed by Rawlins and Counsel, and the only strategy they prepared for, was to attack Brian Sharp's Credibility.  (See Exhibits A and B).  This changed on October 26, 2015, five days before trial, when Counsel acquired Rawlins' 10% ownership of Core Choice for a price of $25,000.00. (See Exhibit C).  Counsel's acquisition of the Core Choice stock created a conflict of interest.  At Counsel's request, Rawlins had provided Counsel with evidence prior to trial, and additional evidence during the trial, that Counsel would use to impeach the testimony of Brian Sharp, but Counsel never used this evidence to attack the credibility of Brian Sharp, which Counsel had assured Rawlins he would during cross-examination of Sharp, or at some other point in the trial. (See Exhibit A).  The assignment of the Core Choice stock to Counsel, which Counsel never advised this Court of in violation of his legal and ethical duty as an officer of the Court to do, resulted in Counsel becoming a business partner with Brian Sharp, the Government's

key witness against Rawlins; Counsel becoming a part owner of one of
the companies from which the Government alleges Rawlins made illegal
cash transfers from; and Counsel acquiring a financial interest in
the outcome of the trial.

**PREJUDICE.**   Counsel's acquisition of the Core Choice stock created
an actual conflict of interest that adversely affected Counsel's
performance.   Through its in limine motion, the Government was
permitted to present substantial evidence attacking the credibility
of Rawlins.   Counsel and Rawlins had determined that the only viable
trial strategy to counter the Government's attack, was its own attack
on Brian Sharp's credibility.   After Counsel acquired part ownership
of Core Choice, Counsel's and Rawlins' interests diverged, with
Rawlins insisting that Counsel launch the attack on Brian Sharp's
credibility that they had agreed to, and Counsel refusing to do so.
Counsel had numerous opportunities to attack Brian Sharp's credibility
which he failed to do:   (1) Counsel could have submitted the proffer
requested by this Court to counter the Government's in limine request
denying Rawlins from presenting evidence of Brian Sharp's extra-
marital affair, and the lies Sharp told his wife and others in order
to hide the affair; (See Ground 2 for details); (2) Counsel could
have presented to the jury the Corporate Resolutions executed by
Brian Sharp authorizing, ratifying, accepting, and confirming all cash
transfers made by Rawlins from the Capital Bank accounts of Prime
Health and Core Choice, which formed the basis of the Government's
Criminal Information; (See Ground 3 for details); and (3) Counsel
could have presented to the jury documentary and testimonial evidence
regarding the numerous lies Brian Sharp told during his testimony.
(See Ground 4 for details).   Counsel was preparing to submit all of
the above evidence to the jury prior to his acquisition of the Core
Choice stock, but submitted none of the evidence after acquiring the
stock.   (See Exhibit A).   Even this Court seemed to observe a
"strategic shift" in Counsel's argument when it noted before trial,
but after Counsel's acquisition of the Core Choice stock, Counsel's
abandonment of his request to present impeachment evidence against
Brian Sharp regarding the deception surrounding Sharp's extra-marital
affair.   (See Trial Transcript, pp. 92-93).   Counsel's shift from his
strategy of attacking Brian Sharp's credibility to not attacking it,
is a clear lapse of representation resulting from his conflict of
interest.   Even though a show of prejudice is not required when
Counsel suffers from an actual conflict of interest that adversely
affects his representation, Rawlins has made such a showing that
is evidenced by Counsel's deficient performance.   The case against
Rawlins was not strong.   There was no direct evidence, and at least
one juror was highly distraught over the verdict which the juror
expressed to the Prosecutor immediately after the trial, and which
the Prosecutor failed to follow up on.   (See "Strength of the
Government's Case" infra.).   Had the jury heard evidence that Counsel
had become a business partner with the Government's key witness, and
had a financial interest in the outcome of the trial, or had it heard
any of the other evidence described above, there is a reasonable
probability that it would not have convicted Rawlins.

## G R O U N D   2

**COUNSEL RENDERED INEFFECTIVE ASSISTENCE WHEN HE FAILED TO SUBMIT A PROFFER REQUESTED BY THE COURT IN RESPONSE TO THE GOVERNMENT'S REQUEST FOR AN ORDER PROHIBITING RAWLINS FROM ELICITING EVIDENCE OR TESTIMORY REGARDING THE EXTRA-MARITAL AFFAIR OF THE GOVERNMENT'S KEY WITNESS.**

<u>FACTS.</u>   Counsel had numerous opportunities to attack the credibility of Brian Sharp, the Government's key witness.  One such opportunity was the extra-marital affair carried on by Brian Sharp, and the lies he told his wife, bankers, employes, and clients to hide the affair. The Government recognized that evidence of the affair could jeopardize its case, and filed an in limine motion requesting an order from the Court prohibiting Counsel from presenting any evidence or testimony to the jury regarding the affair.  The Court preliminarily granted the order, and advised Counsel to submit in writing a proffer to the Court by October 28, 2015, showing the relevancy of evidence of the affair.  Counsel assured the Court and Rawlins that the proffer would be timely filed.  When Counsel failed to submit the proffer, the Court reminded Counsel that it was still awaiting receipt of the proffer so that it could make a final decision on the admissibility of evidence of the affair.  Counsel never submitted the proffer, offering no explanation to the Court other than to suggest that it would have been a futile effort because this Court would never change its preliminary order.  (See Trial Transcript, pp. 92-93).  In effect, Counsel was blaming the Judge for his failure to submit the proffer. Had Counsel submitted a proffer, and included the points described below, this Court would have most likely admitted evidence of the affair.  Counsel could have proffered the following:  (1) Counsel could have pointed out that the Government only cited one case where evidence of a witness' affair was not admitted, and that was <u>United States v. Siraf</u>, from the E.D.N.Y.  In <u>Siraf</u>, the Court did deny evidence of a witness' affair, but only because the affair was remote in time, it was 13 years prior to the commission of the offense. This is distinguishable from Rawlins' case; (2) Counsel could have cited the much more applicable case of <u>United States v. Amato</u>, 540 F.3d 153, 165 (2nd Cir. 2008), a case from the S.D.N.Y.  In <u>Amato</u>, the Court held that cross-examination about a witness' affair was permissible where the affair was recent in time.  Brian Sharp's affair was contemporaneous to the charged offense, and to add to the relevancy, the affair was connected to the offense.  <u>Amato</u> shows clearly that authority is plainly on the side of allowing evidence about a witness' affair in a case such as Rawlins'.  Any competent Counsel could have located <u>Amato</u> and include it in a proffer; and (3) Counsel could have simply requested a limiting instruction to accompany the admission of evidence of the affair.  There is a strong presumption that juries follow a Court's limiting instructions.  The Court could have instructed the jury to consider the evidence of the affair only for the purpose of assessing Brian Sharp's credibility,

and not to allow any emotional response to prejudice their assessment. Such an instruction would have cured any possibility that an emotional response to the affair would have affected the jury's decision.

**PREJUDICE.**  Rawlins was prejudiced by Counsel's deficient performance when he failed to submit the written proffer requested by this Court. The Government's case was not strong.  The Government recognized this, which is the reason it filed the in limine motion seeking to deny evidence of the affair.  The reason given by the Government, that evidence of the affair "runs a high risk of inflamming the jury" is overstated.  It is not likely that the sophisticated juries of New York City would be "inflammed" by evidence of an affair.  It is more likely that the jury would conclude that if Brian Sharp is capable of lying to his wife, bankers, employees, clients, and everyone else around him for over three years while he carries on his affair, then he is certainly capable of lying about any other matter.  Had Counsel submitted the proffer, and had Counsel cited the Second Circuit authority of <u>Amato</u>, and had Counsel requested a limiting instruction, this Court likely would have allowed cross-examination of Brian Sharp regarding his extra-marital affair and the lies he told to shield the affair.  Had the jury heard this evidence of Sharp's deceptive nature, there is a reasonable probability that it would not have convicted Rawlins.

<u>G R O U N D   3</u>

**COUNSEL RENDERED INEFFECTIVE ASSISTANCE WHEN HE FAILED TO PRESENT EVIDENCE AT RAWLINS' TRIAL THAT WOULD HAVE SHOWN THE CASH TRANSFERS THAT BRIAN SHARP, THE GOVERNMENT'S KEY WITNESS, TESTIFIED WERE NOT AUTHORIZED AND WERE ILLEGAL HAD BEEN PREVIOUSLY DECLARED AUTHORIZED AND LEGAL IN WRITTEN DOCUMENTS EXECUTED BY BRIAN SHARP.**

**FACTS.**  Brian Sharp, the majority owner of Prime Health Services and Core Choice, and the Government's key witness, testified at trial that the cash transfers Rawlins had made from the Capital Bank accounts of Prime Health and Core Choice were not authorized by him and were illegal.  During the Government's summation, the AUSA asked the jury to look at all the documents submitted at the trial, and if they did, they would find no documents authorizing the cash transfers.  (See Trial Transcript, p. 2024).  However, there were documents in existence, executed by Brian Sharp, that not only authorized Rawlins' cash transfers, but also proved that all cash transfers made by Rawlins had been declared legal by Brian Sharp.  Rawlins provided these documents to Counsel prior to the trial, and Counsel had them in his possession during the trial, but failed to present them to the jury.  (See Exhibit A).  These documents consisted of two Corporate Resolutions issued by Prime Health Services, and signed by Brian Sharp.  When Counsel first received these Corporate Resolutions, his initial reaction was that they represented "smoking guns" that would "destroy" Brian Sharp's credibility, and "destroy" the Government's

case.  (See Exhibit A).  Rawlins no longer has copies of these
Corporate Resolutions, but their existence has been validated by
United States Magistrate Judge Joe B. Brown in the Middle District
of Tennessee.  (See Exhibit D).  Judge Brown's findings have been
adopted by United States District Judge Waverly D. Crenshaw, Jr.
The first Corporate Resolution was executed by Brian Sharp on
January 18, 2012, and according to Judge Brown, was "conclusive
evidence" of Rawlins' authority to make withdrawals from Prime
Health's accounts at the Capital Bank.  The second Corporate
Resolution was executed by Brian Sharp on October 24, 2013, and
"ratified, approved, and confirmed" all prior withdrawals made by
Rawlins from Prime Health's accounts at the Capital Bank.  These
documents represent positive and conclusive proof that Brian Sharp
had full knowledge of, and had approved and authorized all of the
cash transfers that the Government had claimed were illegal, and
formed the basis of the Criminal Information, and that Brian Sharp
had lied when he testified otherwise.  Counsel had assured Rawlins
that he would admit these Corporate Resolutions into evidence at
trial, and that he would confront Brian Sharp with them during Sharp's
cross-examination, but Counsel failed to do so.  When Rawlins asked
Counsel for an explanation, Counsel stated that he would explain it
to Rawlins later, which Counsel never did.

**PREJUDICE.**  These Corporate Resolutions represented written prior
statements made by Brian Sharp that were inconsistent with his trial
testimony.  Counsel had a duty to present them to the jury, and the
jury had a right to review them during its deliberations.  The
October 24, 2013 Resolution was executed by Brian Sharp after Rawlins
had made the cash transfers contained in the Government's Criminal
Information.  Brian Sharp ratified all of these cash transfers that
the Government had alleged were illegal.  To ratify means to confirm
and accept a previous act thereby making the act legal from the
moment it was done.  (See Black's Law Dictionary, 8th ed., p. 1289).
Two years prior to trial, Brian Sharp had made a formal written
declaration that all of the cash transfers made by Rawlins from the
Capital Bank accounts of Prime Health were authorized and legitimate,
then testified at Rawlins' trial that these same transfers were not
authorized and legitimate.  Counsel had these Corporate Resolutions
in his possession at the time that Brian Sharp was giving his false
testimony.  Counsel had promised Rawlins that he would present these
documents to the jury, and he would confront Brian Sharp with this
highly impeachable evidence, but Counsel never did.  Instead, Counsel
lulled Rawlins into believing he would present them later in the
trial, which he never did, and offering no explanation for his
actions.  Rawlins was prejudiced by Counsel's deficient performance
regarding the Corporate Resolutions.  Had the jury been exposed to
these documents, and had the jury known that Brian Sharp had
testified in a manner inconsistent with these prior written statements,
there is a reasonable probability that it would not have convicted
Rawlins.

# G R O U N D   4

**COUNSEL RENDERED INEFFECTIVE ASSISTANCE WHEN HE FAILED TO PRESENT EVIDENCE IN HIS POSSESSION TO THE JURY THAT WOULD HAVE SHOWN THAT THE GOVERNMENT'S KEY WITNESS LIED ON NUMEROUS OCCASIONS WHEN HE TESTIFIED AT RAWLINS' TRIAL.**

**FACTS.**  As stated throughout this motion, and conceded to by the Government, the principle issue at trial was the credibility of Brian Sharp, the Government's key witness.  This is evident from the in limine motion filed by the Government seeking to prohibit Rawlins from cross-examining Brian Sharp regarding his extra-marital affair, and seeking to prohibit Rawlins from questioning Sharp regarding several other areas that would have impeached Sharp's credibility. However, Counsel had numerous other opportunities to attack Brian Sharp's credibility when he lied to the jury during his testimony, but Counsel failed to do so:

(a) **Applied Metrics.**  During the cross-examination of Brian Sharp, Counsel asked Sharp if Prime Health Services had acquired a company called Applied Metrics.  Sharp responded that Prime Health had attempted to acquire Applied Metrics, but that the acquisition never happened.  (See Trial Transcript, pp. 409-10).  Brian Sharp lied to the jury when he made this statement.  On February 15, 2011, Brian Sharp issued national and local press releases announcing that Prime Health had completed the acquisition of Applied Metrics from BRM Global, Inc. (See Exhibits E & F).  BRM Global was owned by Steve Rawlins.  (See Exhibit G).  The Purchase Agreement showed that the price paid for Applied Metrics was "one dollar and other valuable consideration."  Sharp and Rawlins had an oral agreement that Sharp would pay Rawlins 3 million dollars for Applied Metrics.  It was Sharp's desire to conceal the true purchase price, because at that time Sharp still owed his ex-wife 3 million dollars from their divorse settlement.  The acquisition of Applied Metrics coincides with the first alleged illegal cash transfers Rawlins made from the Prime Health and Core Choice accounts at the Capital Bank, both occurring during the first half of 2011.  Sharp had authorized Rawlins to make the cash transfers as payments towards the purchase of Applied Metrics, which explains the reason that Sharp later ratified these cash transfers.  During trial, Sharp denied the purchase of Applied Metrics, because had he acknowledged it, he would have had to explain the method of payment, which would have undermined not only the Government's case, but also the 5.3 million dollar civil suit Prime Health had filed against the Capital Bank. Counsel was in possession of the documentation to expose Sharp's lie about the purchase of Applied Metrics, and was aware of the reasons Sharp had decided to deceive the jury on this issue.  Yet, Counsel failed to confront Sharp with the evidence of this blatant deception, in total disregard of the trial strategy of attacking the credibility of Brian Sharp at every opportunity, and in total disregard of Counsel's sworn duty to zealously defend his client.

**(b) Nathan Auslander.**  During the re-direct of Brian Sharp, the AUSA asked Sharp about an accounts receivables loan Prime Health was seeking from Nathan Auslander.  Brian Sharp responded that he was aware of the loan request, and what he remembered most about it was that the documentation submitted in support of the loan had been "very, very inflated."  The AUSA then asked Sharp who at Prime Health had submitted the inflated documentation to Nathan Auslander, and Sharp responded that Rawlins had.  (See Trial Transcript, p. 551).  Brian Sharp lied to the jury when he made this statement.  According to an affidavit by Nathan Auslander, it was Brian Sharp personally who had submitted the inflated accounts receivables documentation to him.  Not only that, but Auslander swears under oath that Sharp also lied about the age of the receivables, lied when he stated that the Capital Bank had not called his loan, and lied by omission when he failed to disclose that a large portion of the receivables were from Core Choice, a related company.  In order to hide his lies, Auslander affirms that Sharp directed him to speak with no one at Prime Health about the loan other than himself, including not being able to speak to Rawlins, but that it was Rawlins who eventually exposed Sharp's lies to Auslander.  (See Exhibit H).  After Sharp had testified that Rawlins had been the one who submitted the inflated accounts receivables numbers to Auslander, Rawlins contacted Auslander and asked him if he would come to his trial and testify about the loan request, and Auslander agreed to.  Rawlins advised Counsel that Auslander would testify, and Counsel advised Rawlins that he would contact Auslander and would issue him a subpoena to testify for Rawlins during the defense.  (See Exhibit A).  As the defense progressed, Rawlins asked Counsel about Auslander, and Counsel assured Rawlins that he had spoken with Auslander, and had issued the subpoena, and that Auslander would be there.  When the trial ended, Rawlins contacted Auslander, and Auslander told Rawlins that he had never heard from Counsel, and never received a subpoena.  (See Exhibit H).  Rawlins confronted Counsel, and Counsel admitted that he had not contacted Auslander, and told Rawlins that he would explain it to Rawlins later, which he never did.

**(c) Sports Suites.**  During the direct examination of Brian Sharp, the AUSA asked Sharp if he had ever attended any sporting events with Rawlins at the Nissan Stadium or the Bridgestone Arena, and Sharp acknowledged that he did.  The AUSA then asked Sharp if any of his clients ever attended the events with him, and Sharp responded, "No, no."  (See Trial Transcript, p. 223).  Sharp lied when he made this statement.  According to three affidavits attached to this motion, Sharp routinely brought his clients and his prospective clients to Rawlins' private suites to attend various sporting events and other special events.  Sharp also frequently told his clients that the suites actually belonged to him and not to Rawlins.  Rawlins told Counsel that Sharp was lying about his clients attending the private suites with him, and that Brandon Rawlins and Larry Aikens would testify to this.  Counsel advised Rawlins that he would contact each individual and arrange for them to appear at the trial, but Counsel failed to do so, and provided no explanation for his failure.

**PREJUDICE.**   Counsel had acknowledged, and the Government had conceded, that the principle issue in Rawlins' case was the credibility and the believability of Brian Sharp.   Counsel had readily available documents and testimony that would prove that Sharp lied about the acquisition of Applied Metrics, that Sharp lied about the accounts receivables loan request from Nathan Auslander, and that Sharp had lied about his clients use of Rawlins' private suites.   Counsel failed to present any of this evidence to the jury, and lied to Rawlins about his intent to use it.   Rawlins' was prejudiced by Counsel's deficient performance. The case against Rawlins was not strong.   There was no direct evidence and at least one juror was highly conflicted about Rawlins' quilt. (See "Strength of the Government's Case" infra.).   Had Counsel presented the evidence in his possession to the jury regarding the lies told by Sharp during his testimony, there is a reasonable probability that the jury would not have convicted Rawlins.


## G R O U N D   5


**RAWLINS WAS DENIED HIS RIGHT TO DUE PROCESS AT SENTENCING WHEN HE WAS DEPRIVED OF HIS PROPERTY WHEN HIS RESTITUTION AND FORFEITURE AMOUNTS WERE BASED UPON UNCHARGED CONDUCT.**

**FACTS.**   Rawlins was charged in a One-Count Information and convicted at trial of Wire Fraud for allegedly making illegal cash transfers from the Capital Bank accounts of Prime Health Services and Core Choice.   None of the cash transfers were charged as separate counts in the Information.   As such, Rawlins has never been charged with, or convicted of, any of the actual cash transfers the Government claimed were made illegally.   In fact, the Government's Information refers to these cash transfers only as "examples," and in most cases identifies no specific amounts or dates for the transfers, including the transfer the Government claimed establishes venue in the S.D.N.Y. The Government's Information also claimed only that Rawlins used the funds "in part" to pay his personal expenses and those of others. (See Doc. 18, p. 4).   But the Government provides no breakdown on which "part" went towards Rawlins' personal expenses, and which "part" went towards legitimate expenses.   At sentencing, Rawlins' restitution and forfeiture amounts were based entirely on conduct that was never charged, or never specifically identified in the Criminal Information. Rawlins must be presumed innocent of all conduct for which he was not charged and convicted.   If Rawlins is presumed innocent of this conduct, the Court cannot punish him by depriving him of his property.

**PREJUDICE.**   Rawlins was prejudiced when he was deprived of property through restitution and forfeiture based upon conduct for which he was never charged or convicted, and in many cases not specifically identified.   Rawlins is entitled to a new sentencing hearing where this uncharged conduct is not used to determine the amount of his restitution and forfeiture.

13.   No ground raised in this motion was raised on direct appeal or in any other Federal Court because they involve issues more suitable to be heard in a Section 2255 proceeding.

14.   Rawlins has no motion, petition, appeal now pending in any Court challenging the judgment of conviction.

15.   Rawlins was represented by Richard Braun, Braun & Associates, PLLC, 501 Union Street, Suite 500, Nashville, TN 37219 during all proceedings up to and including trial.   Rawlins was represented by Steven Brill, Sullivan & Brill, LLP, New York, NY during trial and direct appeal.   All motions and petitions filed after the direct appeal have been filed pro se by Rawlins.

16.   Rawlins was sentenced on only one Count on only one Information.

17.   Rawlins has no future sentence to serve after completion of the sentence he is now serving for the judgment of conviction he is now challenging.

18.   Rawlins' Section 2255 motion is timely filed.


## STRENGTH OF THE GOVERNMENT'S CASE

The Government always claims that the evidence against the defendant is overwhelming, even when it clearly is not.   This claim was made by the Government at Rawlins' sentencing, and certainly will be made again when it responds to this motion.   But consider the facts.   Evidence is overwhelming when it consists largely of direct or physical evidence, such as, fingerprint or DNA evidence, wiretap or other surveillance type of evidence, co-defendants

testifying pursuant to a plea agreement, or contraband seized from the person or property of the defendant that would implicate him in the crime.  No evidence of this type connecting Rawlins to the charged offense was introduced at trial.  Since Rawlins never denied making the cash transfers, this case revolved solely around Brian Sharp's testimony that the transfers were not authorized versus Rawlins' testimony that the transfers were authorized.  The jury and Court are allowed to select the person they consider to be the most credible, and in this case, they selected Brian Sharp.  But selecting one person's credibility over another's is not overwhelming evidence of guilt.  Had the jury heard that Rawlins' attorney owned 10% of Core Choice's stock, or had it seen copies of the Corporate Resolutions signed by Brian Sharp authorizing and legitimizing the alleged illegal cash transfers, or had Counsel submitted the proffer and was allowed to cross-examine Sharp about the lies he told regarding his extra-marital affair, or had the jury heard the other evidence of lies told by Sharp during his testimony, the jury might have reached a different decision about credibility.  This is especially true now since it has been revealed that at least one juror was highly distraught over the decision to convict, and expressed this sentiment immediately following the trial.  (See Exhibit J).  This juror went through a lot of trouble to locate the Prosecutor's LinkedIn Profile to show the concern the juror had over the verdict.  The Government's case was not overwhelming.  Had Counsel presented any of the evidence articulated in the grounds stated in this motion, the jury most likely would have reached a different decision.

## EVIDENTIARY HEARING

The Second Circuit has held that the procedure for determining whether a hearing is necessary is that a Court should usually hold a hearing if material facts are in dispute. Puglisi v. United States, 586 F.3d 209, 213 (2nd Cir. 2009). To warrant a hearing, a defendant claiming ineffective assistance of counsel need establish only that he has a plausible claim, not that he will necessarily succeed. Id. Claims of ineffective assistance of counsel ordinarily require a hearing. Armienti v. United States, 234 F.ed 820, 825 (2n Cir. 2000). Dismissal without a hearing is especially inappropriate for claims that involve off-the-record interactions with trial counsel. Chang v. United States, 250 F.3d 79, 85 (2nd Cir. 2001). Unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall...grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. 28 U.S.C. § 2255. In evaluating the need for a hearing, courts should also be careful to show appropriate solicitude to pro se petitioners in order to avoid the "harsh and unfair results" that might occur from holding them to the standards of counseled litigants. Pham v. United States, 317 F.3d 178, 187 (2nd Cir. 2003). In Rawlins' case, an evidentiary hearing needs to be held as to the existence of both the alleged conflict created by counsel's acquisition of Core Choice stock and any resultant lapse in representation reflected by the alleged change in counsel's conduct of Rawlins' defense, and as to whether counsel rendered inffective representation by failing to present to the jury impeachable evidence regarding Brian Sharp.

## RESERVATION OF RIGHTS

Rawlins reserves the right to request Discovery under Rule 6 or to Expand the Record under Rule 7 of the Rules Governing Section 2255 Proceedings in the event it becomes necessary to contest an argument put forth by the Government in its Response, or to support a Ground raised in this Motion.

**WHEREFORE**, Rawlins Requests this Honorable Court to Vacate his Conviction, and to Vacate his Restitution and Forfeiture, or in the Alternative, to Grant him an Evidentiary Hearing, and an Opportunity to Prove the Allegations contained herein, and to Grant him Whatever Additional Relief this Court deems Appropriate.

**VERIFICATION**:   I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746 THAT THE FOREGOING IS TRUE AND CORRECT, and that this Motion was Executed on this 27th day of December, 2018.

Respectfully submitted,

Steven Rawlins
Reg. No. 22715-075
Federal Prison Camp
P.O. Box 2000
Millington, TN 38083

- 14 -

<u>E X H I B I T S</u>

Exhibit "A"  -   Affidavit of Steve Rawlins            -  2 Pages

Exhibit "B"  -   Affidavit of Brandon Rawlins          -  2 Pages

Exhibit "C"  -   Assignment of Core Choice, Inc.       -  3 Pages
                 Stock to Richard Braun

Exhibit "D"  -   Excerpt from Prime Health's Lawsuit   -  3 Pages
                 Against Capital Bank Showing Judge
                 Brown's findings regarding the
                 Corporate Resolutions executed by
                 Brian Sharp

Exhibit "E"  -   Brian Sharp's Announcement of Prime   -  2 Pages
                 Health's acquisition of Applied
                 Metrics in the Business Wire

Exhibit "F"      Brian Sharp's Announcement of Prime   -  1 Page
                 Health's Acquisition of Applied
                 Metrics in Nashville Post

Exhibit "G"  -   Certificate of Incorporation Showing  -  1 Page
                 Steve Rawlins as owner of BRM Global

Exhibit "H"  -   Affidavit of Nathan Auslander         -  1 Page

Exhibit "I"  -   Affidavit of Larry Aikens             -  2 Pages

Exhibit "J"  -   Email from Juror to AUSA Defilippis   -  1 Page
                 Expressing Doubt about Verdict and
                 Desire to Ask Questions about Case

## AFFIDAVIT OF STEVE RAWLINS

I submit this affidavit in support of my Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody under 28 U.S.C. § 2255, and state as follows:

That my Counsel, Richard Braun, and I had numerous discussions prior to and during my trial regarding trial strategy. That at all times, Counsel and I had determined that the only viable strategy to be employed would be an attack on the credibility of Brian Sharp, the Government's key witness. That at the request of Counsel, I collected and provided to him certain information and documentation to be used to attack Brian Sharp's credibility, that Counsel never used any of this information and documentation to attack Brian Sharp's credibility, and that Counsel never provided me with any explanation for his failure to do so, even though I repeatedly requested that he explain himself.

As to the facts alleged in Ground 1, I declare that prior to my trial, I owned 10% of Core Choice, Inc. That on October 26, 2015, I assigned my 10% interest in Core Choice to my Counsel in exchange for a payment of $25,000.00. That after Counsel was assigned my Core Choice stock, he refused to attack the credibility of Brian Sharp, even though we had determined that it would be the most viable strategy as my trial defense. That Counsel refuse to confront Brian Sharp during cross-examination with the information and documentation which I had provided him as he had assured me he would do. And that Counsel had lulled me with lies that he would be attacking Sharp's credibility at a later point in the trial, which he never did.

As to the facts alleged in Ground 2, I declare that I asked Counsel on several occasions whether he had submitted the proffer that Judge Nathan had directed him to submit by October 28, 2015. That Counsel told me that he had completed the proffer, and would be submitting it to the Judge by the October 28th deadline. That when he missed the deadline, Counsel assured me that he considered the proffer to be a critical element of my defense, that he re-assured me that the proffer had been completed, and that he would definitely submit it before he cross-examined Brian Sharp. But the proffer was never submitted, and Counsel lied again when he said he would explain it all later, which he never did.

As to the facts alleged in Ground 3, I declare that I delivered to Counsel copies of two Corporate Resolutions issued by Prime Health Services, Inc., and signed by Brian Sharp. That one of the Corporate Resolutions was dated January 18, 2012, and authorized me to make withdrawals from the Prime Health Services accounts at the Capital Bank. That the second Corporate Resolution was dated October 24, 2013, and ratified, accepted, and confirmed all of my prior withdrawals from the Prime Health Services accounts at the Capital Bank. That when Counsel read these Resolutions, he exclaimed excitement about them, especially the October 24th Resolution that ratified all of the

withdrawals I had made from the Prime Health Services accounts.  That Counsel assured me that this was positive proof that the withdrawals the Government had charged me with had been deemed authorized and legitimate by the Government's key witness in an official written document.  Counsel described the Corporate Resolutions as "smoking guns" that would "destroy" Brian Sharp's credibility, and "destroy" the Government's case.  Counsel told me that he could hardly wait to confront Brian Sharp with these documents, and that he would introduce them during the cross-examination of Sharp.  When Counsel failed to do this, he told me that he had decided to introduce them at a later time in the trial, but he never did.  Counsel again lied to me when he said he would explain everything later, which he never did.

As to the facts alleged in Ground 4, I declare:  (1) That when Brian Sharp testified that Prime Health Services never completed the acquisition of Applied Metrics from my company, BRM Global, Inc., I informed Counsel that Sharp had lied, and that I had the documentation to prove it.  I gave Counsel copies of the Purchase Agreement showing that Prime Health Services had acquired Applied Metrics from BRM Global, and I gave Counsel two Press Releases where Brian Sharp had announced the acquisition of Applied Metrics.  Counsel stated that he would use the documents during his cross-examination of Sharp, but Counsel failed to do this, and told me that he had decided to present the documents through me during my testimony, which he never did. (2) That during Brian Sharp's testimony regarding the Accounts Receivable loan request made by Prime Health Services to Nathan Auslander, I informed Counsel that Sharp had lied when he testified that it was me who had submitted falsified documents showing inflated values for the receivables.  I told Counsel that Nathan Auslander would testify that it was Sharp, not me, who had submitted the inflated values, and that Sharp had lied when he said that the Capital Bank had not called their loan, and that Sharp had also instructed Auslander not to speak with anyone regarding the loan except him.  Counsel told me that he would issue a subpoena immediately to Nathan Auslander, and have him testify during my defense, but Counsel never did.  (3) That when Brian Sharp testified that Prime Health Services' clients and prospective clients never used my private suites at the Bridgestone Arena and Nissan Stadium, I told Counsel that Sharp had lied, and that his clients frequently used them.  I told Counsel that Brandon Rawlins and Larry Aikens would both testify that Sharp's clients were regular attendees at the private suites, and that Sharp told his clients that the suites actually belonged to him.  Counsel said he would take care of it, and have these individuals at the trial to testify in my defense, but he never did.

I declare (or certify, verify, or state) under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Date: 12/22/2018

Steve Rawlins

Exhibit "A" - P. 2

## AFFIDAVIT OF BRANDON RAWLINS

I am the son of Steven Rawlins and resident of Brentwood, TN. From 2001 through 2015, I worked with my father, mainly in the area of Information Technology. I am well acquainted with Brian Sharp, the owner of Prime Health Services and Core Choice. I am also very familiar with Mr. Sharp's activities and those of his businesses.

After my father's arrest on the basis of wire fraud, he retained Richard Braun as his defense counsel. During the time leading up to my father's trial, I was present via conference calls during several meetings between Mr. Braun and my father. The primary purpose of these meetings was to develop a defense strategy. After Mr. Braun interviewed my father and received discovery from the prosecution, he concluded that the believability of Brian Sharp would determine the outcome of the trial. Mr. Braun advised my father that the most viable defense would be to attack Brian Sharp's credibility.

I also had contact with Mr. Braun prior to the start of the trial. The purpose of my contact was to review the strategy and prepare for my possible testimony. I informed of my knowledge of Brian Sharp's affair with Bethany Cook and informed that I overheard Mr. Sharp tell my father directly that he would be with Bethany and they needed to have a cover story to tell Sharp's then-wife, Lynn. I provided Mr. Braun in writing, detailing these conversations as Mr. Braun had informed that he needed this information to submit to the court. I later found out that Mr. Braun never used my testimony and that the Judge had decided that no testimony about the affair could be used at the trial.

It was also decided by Mr. Braun that my testimony would be utilized to refute any testimony of charges from Brian Sharp that were false or misleading. After Mr. Sharp testified, my father and I identified two incidents where I had personal knowledge that Sharp provided false testimony. First, Brian Sharp lied when he testified that he never used my father's suites at Bridgestone Arena and Nissan Stadium. I was present at the suites on several occasions where Sharp was in attendance with his employees, members of his family, and his clients. When clients or prospective clients were at the suites, Mr. Sharp went out of his way to give the impression that the suites belonged to him. A record of each person in attendance at every suite event was kept during the duration that my father's company had the suites in order to disperse tickets appropriately. Second, Brian Sharp lied when he testified that the purchase of Applied Metrics never happened. Mr. Sharp ratified a contract signed by Mr. Sharp, my father, and Randy Howell agreeing to the purchase. Mr. Sharp provided media outlets with an official announcement of the Applied Metrics purchase and continues to have this announcement available on his corporate website.

I informed Mr. Braun that I was willing to testify about the incidents in which Brian Sharp lied and it was relayed to me that I would be asked about this when I testified, however it was later relayed to me that Mr. Braun had changed his mind and I would not be testifying. I was never informed why Mr. Braun decided not to use my testimony.

Had Richard Braun called me to testify, I would have testified exactly as I have stated above. I am willing to provide this testimony at any time if asked to do so.

_____
Brandon Rawlins

Date executed: __11/6/18__

## NOTARY PUBLIC

The foregoing instrument was acknowledged by _Brandon Rawlins_ who has placed his/her signature on this instrument before me personally, and is known to me or has produced _TN-DL_ as identification and who did take an oath, this _6th_ day of _November_, _2018_.

My Commission Expires _03-18-19_

Notary Public Signature _____

RAMON MONTALVO
STATE
OF
TENNESSEE
NOTARY
PUBLIC
RUTHERFORD COUNTY

# AGREEMENT AND ASSIGNMENT
# OF
# STOCKHOLDER RIGHTS

This Agreement and Assignment of Stockholder Rights (this "Agreement") is made and entered into as of October 26, 2015 (the "*Effective Date*") by and between **STEVEN RAWLINS** ("*Assignor*") and **RICHARD J. BRAUN** ("*Assignee*") (collectively the "*Parties*").

## RECITALS

**WHEREAS**, Assignor owns the rights to ten percent (10%) of the Common Stock of CoreChoice, Inc.; and

**WHEREAS**, Assignor desires to assign, and Assignee desires to acquire, one hundred percent (100%) of Assignor's 10% of the Common Stock of CoreChoice, Inc.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, the Parties hereby agree as follows:

1.      **Assignment of Ownership Interest.**  Effective as of the Effective Date, subject to the terms and conditions set forth herein, Assignor hereby sells, transfers, assigns, sets over and delivers 100% of Assignor's rights to 10% of the Common Stock of CoreChoice, Inc. to Assignee and his respective successors and assigns.

2.      **Consideration.**  In consideration for the assignment, and other covenants and agreements contained herein, Assignee has paid to Assignor an aggregate amount equal to twenty-five thousand dollars ($25,000) in cash.  Assignor, by execution below, acknowledges the receipt of such consideration.

12.22.15 10:30
F:\clients - active\rawlins (ny)\stock\agreement and assignment of stockholder rights (corechoice) docx
**BRAUN & ASSOCIATES, PLLC**

Exhibit "C" – P. 1

3.    **Binding Effect**.  This Agreement shall be binding upon and inure to the benefit of the successors, assigns, and distributees, heirs, legal representatives, executors and administrators of each of the Parties.

4.    **Severability**.  If any provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provisions to persons or circumstances, other than those to which it is held invalid and unenforceable, shall not be affected thereby and each provision of the Agreement shall be valid and enforced to the fullest extent permitted by law.

5.    **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, and when each Party shall have executed one counterpart and delivered it o the other Party, all the counterparts together shall constitute one and the same instrument, binding on and enforceable against each Party.  Photocopies, facsimile transmissions and other productions of this Agreement (with reproduced signatures) shall be deemed to be original counterparts.

6.    **Governing Law**.   This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee applicable to agreements made, and to be performed in such jurisdiction, without giving effect to any conflicts of law principles thereof.

*[Signatures to this Agreement are on Next Page]*

12.22.15.10.30
f:\clients - active\rawlins (ny)\stock\agreement and assignment of stockholder rights (corechoice).docx
BRAUN & ASSOCIATES, PLLC

Exhibit "C" – P. 2

*[Signature Page to Agreement and Assignment of Stockholder Rights (CoreChoice, Inc.)]*

**IN WITNESS WHEREOF,** the Parties have duly executed this Agreement to be effective as of the effective date.

**ASSIGNOR:**         **ASSIGNEE:**

_____  _____
Steven Rawlins         Richard J. Braun

**WITNESS:** _____
     Mary Leech

**WITNESS:** _____
     Lynne Stephens

12.22.15 10.30
f:\clients - active\rawlins (ny)\stock\agreement and assignment of stockholder rights (corechoice).docx
**BRAUN & ASSOCIATES, PLLC**

**Exhibit "C" – P. 3**

Rawlins. Without the loan, Prime contends, it would have had less money for Rawlins to steal. By the same token, Prime agreed to provide monthly financial statements to inform Capital of its ability to repay the loan. Because Capital allegedly elected not to review those statements, which were to be produced solely for Capital's benefit, Prime cries foul.

Had Capital supervised Prime's finances, Prime argues, the embezzlement scheme by Rawlins'—whom Prime had expressly authorized to transfer money and conduct business on its behalf—would have been revealed. After Rawlins made wire transfers that were determined by Prime (years later) to be improper, Prime blames Capital for allowing Rawlins to do so. According to Prime, Capital should have questioned how Prime was spending its money instead of discharging its contractual and statutory duty to transfer the money at Prime's request.

All of this, Prime asserts in its Complaint, equates to negligence on the part of the Capital. But it is not. A bank that lends money to a borrower does not have a duty (i) to protect those funds from subsequent theft by a third party, (ii) to surveil or investigate a borrower's finances to detect internal fraud by a borrower's employees and authorized agents, or (iii) to second-guess how a borrower spends the money in its demand-deposit accounts. Nor is it foreseeable that a borrower's CFO would use the funds in his company's bank account not for the company's benefit but rather to enrich himself. Thus, Capital did not breach any duty owed to Prime. Any losses Prime may have suffered were caused by the criminal acts of its acting CFO, Rawlins, and the negligent failure of Prime and its CEO, Brian Sharp, to monitor Rawlins' activities.

Prime's claims are also barred for the additional following reasons:

(a)     Prime signed a "Consolidation and Extension of Loans and Forbearance Agreement" dated February 7, 2014, that constitutes a waiver, release, and/or accord and satisfaction of Prime's claims.

3

(b)      Prime executed a corporate resolution dated January 18, 2012, pursuant to its account agreement with Capital's predecessor in interest dated September 28, 2006, authorizing Rawlins to make withdrawals from its accounts, which was "conclusive evidence of [his] authority to act on behalf of [Prime]."

(c)      In violation of its account agreement, Prime failed to examine its statements of account with reasonable promptness and no later than 30 days from when the statements were first sent or made available to it, and Capital Bank acted in good faith.

(d)      In violation of its account agreement, Prime discovered or reasonably should have discovered Mr. Rawlins' allegedly fraudulent transactions but failed to promptly notify Capital Bank of the relevant facts and no later than 30 days from when the statements were first sent or made available to it, and Capital Bank acted in good faith.

(e)      In violation of its account agreement, Prime failed to report the allegedly fraudulent transactions within 60 days from when the statements were first sent or made available to it.

(f)      Prime Health executed a corporate resolution dated October 24, 2013, that "ratified, approved, and confirmed" all prior "transactions, if any, with respect to any deposits, withdrawals, rediscounts and borrowings by or on behalf of [Prime] with [Capital]," including those authorized by Rawlins.

(g)      Prime's causes of action are barred by the statute of limitations.

(h)      Prime's causes of action are barred by the Uniform Fiduciaries Act, Tenn. Code Ann. § 35-2-101 to § 35-2-112.

4

(i)     Capital did not proximately cause Prime's alleged injuries because the criminal acts of Prime's CFO, Rawlins, or the negligent failure of Prime and its CEO, Brian Sharp, to monitor Rawlins' activities, constitute the intervening and superseding cause of those injuries.

(j)     Prime's causes of action are barred by the economic loss doctrine because Prime and Capital are parties to one or more contracts and Prime' claims are tort claims for purely economic losses that do not arise from any injury to person or property.

(k)     Prime's causes of action are barred because the comparative fault of Prime and Brian Sharp, its CEO, individually or jointly, exceeds 50%.

**4.     Identification of the issues:**

The Court ruled on Defendants' Motion to Dismiss (Doc. No. 36), denying the Motion as to Plaintiff's first and second causes of action (negligent supervision and negligent retention, respectively), but granting the Motion as to Plaintiff's third cause of action (aiding and abetting breach of fiduciary duty). (Order, Doc. No. 50.)

The issues that remain include those set forth in Plaintiff's Complaint and those that may be asserted in any amended complaint or responsive pleading or motion. The parties anticipate that other issues may arise throughout the course of this action, including, but not limited to questions of law and issues related to discovery.

**5.     Need for other claims or special issues under Rules 13-15, 17-21, and Rule 23 of the Federal Rules of Civil Procedure:**

Although such issues may arise during the course of litigation, at this time the parties do not anticipate counterclaims, cross-claims, third-party claims, joinder of other parties or claims, class action certification, or the need for resolution of issues arising under the above-cited rules.

**6.     Witnesses, if known, subject to supplementation by each party.**

76.72.186.206

This site uses cookies. By continuing to browse this Business Wire site (and/or any other Business Wire website), you accept the use of cookies.

Learn more (/portal/site/home/privacy/)

I Accept



# Prime Health Services, Inc. Announces Acquisition of Applied Metrics

### *Prime Health Acquires Majority Interest in Applied Metrics, a Medical Outcomes-Based Company*

February 15, 2011 11:00 AM Eastern Standard Time

NASHVILLE, Tenn.--(BUSINESS WIRE)--Prime Health Services, one of the nation's largest workers' compensation, group health, and first party auto liability PPO networks, is pleased to announce it has acquired majority interest in Applied Metrics (a holding of BRM Global Inc.). Applied Metrics provides expertise in analyzing medical outcome-based data for the workers' compensation, auto liability, and health markets.

"Prime Health Services has taken the next evolutionary step in its growth by acquiring majority interest in Applied Metrics. This acquisition reaffirms Prime Health's commitment to providing the market with a quality PPO network based on measurable medical outcome data," said Brian A. Sharp, President and CEO of Prime Health Services Inc. He further stated that "Prime's approach of customizing PPO solutions for our clients now will include the ability to offer them providers with demonstrated patient outcomes, and thus a better ability to control costs."

The integration of services between Applied Metrics and Prime Health Services is expected to be completed by the end of the first quarter of 2011. This addition makes Prime Health the only known non-risk bearing and payer neutral workers' compensation PPO to offer an outcomes-based model for all provider specialties.

## About Prime Health

Founded in 1996 and based in Brentwood, TN, Prime Health Services (Prime Health) is a managed care company that offers a full spectrum of services, including a Preferred Provider Organization (PPO) ready for access with customizable solutions, as well as repricing offerings. Prime Health's PPOs include Workers' Compensation, Group

Exhibit "E" - P. 1

Health, and Auto Liability networks. Prime Health has over 700,000 providers and facilities nationwide forming the Prime Health National Delivery System. Prime Health offers our National Delivery System to the TPA, insurance carrier, and self-insured markets. More Information is available at www.primehealthservices.com or by calling 1-866-348-3887.

## Contacts

Prime Health Services
Brian Sharp, 866-348-3887
President/CEO
brian.sharp@primehealthservices.com
or
Bethany T. Sharp, 866-348-3887
Executive Vice President
bethany.sharp@primehealthservices.com

Exhibit "E" – P. 2

Local managed care biz buys data analysis firm | Nashville Post

5/29/18, 7:47 PM

# [NASHVILLEPOST]

**HEALTH CARE**

🕐 FEB 15, 2011

# Local managed care biz buys data analysis firm

**AUTHORS** Erin Lawley

Brentwood-based managed care firm Prime Health Services has **acquired a majority stake** of Applied Metrics, a portfolio company of Nashville's **BRM Global Inc**, a company that provides outcome-based medical data analysis for the workers' compensation, auto liability and health markets. "Prime Health Services has taken the next evolutionary step in its growth by acquiring majority interest in Applied Metrics. This acquisition reaffirms Prime Health's commitment to providing the market with a quality PPO network based on measurable medical outcome data," said Brian A. Sharp, Prime Health's president and CEO. "Prime's approach of customizing PPO solutions for our clients now will include the ability to offer them providers with demonstrated patient outcomes, and thus a better ability to control costs." The corporate integration is expected to be complete by the end of the first quarter. Prime Health, based in Brentwood, has more than 700,000 providers and facilities in its nationwide delivery system.

HEALTH CARE   APPLIED METRICS   MANAGED CARE   DATA ANALYSIS   HEALTH INSURANCE

Exhibit "F"

State of D...
Secretary of Sta...
Division of Corporations
Delivered 08:13 PM 06/19/2007
FILED 06:19 PM 06/19/2007
SRV 070717563 - 4376622 FILE

# CERTIFICATE OF INCORPORATION
# OF
# BRM GLOBAL, INC.

**ARTICLE 1 - NAME.**  The name of this Corporation is **BRM GLOBAL, INC.**

**ARTICLE 2 - REGISTERED OFFICE AND REGISTERED AGENT.**  The registered office in the State of Delaware is to be located at 9 East Loockerman Street,  Suite 3A, in the City of Dover, County of Kent, Zip Code 19901.  The registered agent in charge thereof is Spiegel & Utrera, P.A.

**ARTICLE 3 - PURPOSE.**  The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporations Law of Delaware.

**ARTICLE 4 - CORPORATE CAPITALIZATION.**  The amount of the total stock of this corporation is authorized to issue is 3,000 shares  with a par value of $1.00 per share.  All holders of shares of common stock shall be identical with each other in every respect.

**ARTICLE 5 - INCORPORATOR.**  The name and mailing address of the incorporator is Elsie Sanchez, 9 East Loockerman Street, Suite 3A, Dover, Delaware 19901

**ARTICLE 6 - DIRECTORS.**  The initial Directors of the Corporation shall be Steven W. Rawlins, whose mailing address shall be 611 Commerce Street, Suite 3127, Nashville, Tennessee 37203, which shall be the principal office of the Corporation.

**ARTICLE 7 - SUB-CHAPTER S CORPORATION.**  The Corporation may elect to be an S Corporation, as provided in Sub-Chapter S of the Internal Revenue Code of 1986, as amended, and may thereby subject itself to the privileges, restrictions and limitations set forth therein.

**ARTICLE 8 - INDEMNIFICATION.**  The corporation shall have the power to indemnify any person to the full extent permitted by Title 8, section 145 of the Delaware Code.  A copy of the Indemnification Agreement, if any, is on file at the principal office of the Corporation.

**I, The Undersigned,** for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand this 19 June 2007.

Elsie Sanchez, Incorporator

Exhibit "G"

## AFFIDAVIT OF NATHAN AUSLANDER

I specialize in the structuring and placement of commercial loans. I have known Steve Rawlins since 2009 and have worked with him on numerous commercial loan projects. I first dealt with Brian Sharp in August 2013 when Steve Rawlins asked our company to place an Accounts Receivable loan for Prime Health Services. During the due diligence process, several inconsistencies were discovered in the information submitted directly by Brian Sharp. We also discovered numerous misrepresentations that were made by Brian Sharp. These included Brian Sharp misleading us when he failed to inform us that he was seeking the loan to replace his current bank credit line because the bank had called his loan due to improprieties; representing the A/R were from unrelated third parties when a substantial amount were from Core Choice, a company owned by Brian Sharp; misrepresenting the age of a large portion of his accounts receivables; and misleading us when he omitted a substantial amount of liabilities from his financial statements.

We were also concerned when Brian Sharp told us we were not allowed to speak with anyone at Prime Health Services about the loan request except him, not even Steve Rawlins, who at the time was Prime Health Services' Chief Financial Officer. Based upon our experience with Brian Sharp, it was concluded that he was a deceptive individual whose representations could not be relied upon and the loan was never completed.

After Steve Rawlins' arrest, Steve contacted me and told me that he would be going to trial and that Brian Sharp would be testifying against him. He asked me if I would consider testifying about the experience I had with Brian Sharp and I agreed to testify. Steve Rawlins told me that his attorney, Richard Braun, would be contacting me for an interview and that he would be issuing me a subpoena. I never heard from Richard Braun and I never received a subpoena. Had I testified, I would have testified to the same facts as stated above. I also would have testified that my Steve Rawlins was always straightforward and honest about the issues with Prime Health and the misrepresentations that we were given by Brian Sharp. I am still willing to provide this testimony if asked to do so.

Nathan Auslander

## NOTARY PUBLIC

FOROOGH IRANPOUR
Commission # 2128732
Notary Public - California
Los Angeles County
My Comm. Expires Oct 28, 2019

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of Los Angeles

Subscribed and sworn to (or affirmed) before me this 25th day of Nov , 2018, by Nathan Auslander

_____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____ (Seal)

Exhibit "H"

## AFFIDAVIT OF LARRY AIKENS

My name is Larry Aikens. I am a resident of Clarksville, Tennessee. I have been a close friend of Steve Rawlins for 20 years. After Steve's arrest, I agreed to testify on his behalf. Steve told me that I would be contacted and interviewed by his attorney, Richard Braun, who would issue me a subpoena with the time and location of the trial. I was never contacted by Mr. Braun, received a subpoena, nor was notified of the start of the trial.

Had I testified at Steve's trial, I would have stated that during the time period between 2010 and 2013, I was a frequent guest at Steve's suite at Bridgestone Arena in Nashville, Tennessee, for Nashville Predator hockey games and various concerts. I met Brian Sharp while a guest at the suite and observed him and several of his friends and business associates there on many occasions. I spoke with Mr. Sharp several times and he expressed how impressed he was with the suite and how much he enjoyed using it when entertaining potential clients for his businesses.

I also would have testified that Steve Rawlins had always conducted his business and personal affairs at the highest level of honesty, integrity, and professionalism, and that Steve is a person who is totally devoted to his family and friends.

Larry Aikens

## **NOTARY PUBLIC**

State of Tennessee

County of _Montgomery_

I certify that Larry Aikens appeared before me and is personally known to me, or

presented sufficient identification to me and executed this Affidavit in my presence

by affixing his signature above on this ____20____ day of _September_, 2018.

My commission expires on:

_June 16 2020_

From: ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮
Date: Fri, Nov 20, 2015 at 10:13 AM
Subject: Re: Andrew, please add me to your LinkedIn network
To: Andrew DeFilippis ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮

Mr. DeFilippis
I understand and will respect the rules. I sincerely apologize if my contacting you caused any issues with your case or supervisors. It was a pleasure to (almost) meet you.

▮▮▮▮▮

On Thu, Nov 19, 2015 at 12:11 PM, Andrew DeFilippis ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮> wrote:
▮▮▮▮▮▮▮, Thanks for your LinkedIn invitation and message.  Sorry, but pursuant to the rules of my office and my supervisors, I am not permitted to communicate with jurors even after trial, so I cannot accept the invitation or discuss anything with you.  Best, Andrew DeFilippis

On Tue, Nov 17, 2015 at 6:17 PM, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ wrote:

**Linked in**

I think jury duty may have gone to my head a bit. All day at work I've been muttering "guilty... innocent... guilty... guilty.. guilty.. innocent.." at my co-workers.

Now that the trial is over, am I allowed to ask you a few questions about the case?

**Accept**     View Profile

1

Exhibit "J"



Office of the Clerk
United States District Court
Southern District of New York
U.S. Courthouse - 500 Pearl Street
New York, NY  10007