UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVEN RAWLINS,                     :

      Petitioner/Movant,           :

v.                                  :       Case No. 1:19-cv-00135-AJN
                                                    1:15-cr-00377-AJN

UNITED STATES OF AMERICA,           :

      Respondent.                  :

## PETITIONER'S REPLY TO THE GOVERNMENT'S RESPONSE TO PETITIONER'S SECTION 2255 MOTION

COMES NOW STEVEN RAWLINS, Petitioner/Movant, pro se and files this Reply to the Government's Response to his Section 2255 Motion, and for his cause shows this Court as follows:

### PRELIMINARY STATEMENT

Rawlins raised five claims in his 2255 motion alleging that Counsel rendered ineffective assistance and that his Due Process rights were violated. In its Response, the Government disputes each claim, and further asserts that Rawlins is not entitled to relief because no matter how compelling his claims are the evidence against him was so overwhelming there would not have been a different outcome, and because there are no material facts in dispute, Rawlins is not entitled to an evidentiary hearing.

Rawlins will address these latter two issues first then Reply to each argument put forth by the Government regarding each Ground raised by Rawlins.

Rawlins requests this Court follow the general rule that pro se motions be construed liberally, and be interpreted to encompass

any legally valid ground for relief under 28 U.S.C. § 2255, regardless of the language employed.

## EVIDENCE WAS NOT OVERWHELMING

On numerous occasions throughout its Response the Government claims that the evidence against Rawlins was overwhelming. The Government summarizes the evidence as follows: (1) thousands of pages of credit card bills showing payment of personal expenses; (2) company ledgers containing fraudulent entries made by Rawlins; (3) testimony of Prime Health employees who observed aspects of Rawlins' fraud; (4) testimony of prior bad acts allegedly committed by Rawlins; and (5) emails from Rawlins admitting he owed Prime Health hundreds of thousands of dollars. (Gov't Response, p. 21).

The evidence was all circumstantial. While sufficient for a conviction, it was not overwhelming. Rawlins admitted he transferred the funds, so the thousands of pages of bills added nothing to the strength of the case. No doubt the volume of the bills impressed the jury, which was the Government's intent, but a large number of exhibits does not make the evidence overwhelming.

Whether the ledger entries were fraudulent was not based on positive knowledge. It was someone's opinion, formed in hindsight, after Rawlins was accused. This was also the case with the employee observations. These employees only interpreted Rawlins' behavior as suspicious after the accusation. And the employees who testified about the ledger entries and Rawlins' behavior all worked for Sharp. These were not expert witnesses. They were witnesses who were indebted to Sharp for their means of support. Testimony of this

- 2 -

sort does not make the Government's evidence overwhelming.

Evidence of prior bad acts, which basically claims if he did it in the past, he must be guilty now, is a common ploy used by the Government. Ironically, it undermines the strength of the Government's case. The only purpose for introducing evidence of prior bad acts is because the case cannot stand on its own, and must be propped up. In Rawlins' case, the prior bad acts had never been proven in a court of law, and constituted evidence, not based on proven knowledge, but based upon a person's opinion.

The emails Rawlins sent to Prime Health were not admissions of fraud. Rawlins was acting like any reasonable businessman would who was in his situation. He reviewed his billings and determined that he owed Prime Health a certain amount of money, and was attempting to reach a negotiated settlement.

What the Government's evidence does not include is more telling. There were no wiretapped conversations, no video or audio surveillance, no testimony from a cooperating co-defendant or confidential informant, no fingerprint or DNA evidence, no admission of fraud, no use of front companies or aliases, no off-shore bank accounts or attempts to hide the proceeds, and no other direct evidence of any type.

At least one juror expressed grave concern over the decision to convict, and contacted the prosecutor immediately following the trial to alert him of this concern. The prosecutor reported it to the Court but neither the Court nor the prosecutor investigated the matter, and Rawlins was never advised of it.

The evidence was not overwhelming. In fact, it was subject to a wide range of interpretation. The jury elected to believe Sharp over

Rawlins.   But had Defense Counsel Braun exposed the jury to the numerous instances of false testimony made by Sharp detailed in the 2255 motion, and which was not refuted in Braun's affidavit or by the Government, the jury may have reached a different decision.

The strength of the Government's evidence is a major factor this Court will consider when determining whether Rawlins was prejudiced by Counsel's ineffective representation.   That is the reason Rawlins placed this first in his Reply.   Rawlins respectfully requests this Court to consider the facts put forth here as it weighs the strength of the evidence and makes its finding on each claim raised by Rawlins.

## EVIDENTIARY HEARING IS REQUIRED

The 2255 statute is clear.   If the files and records of the case do not conclusively shows that Rawlins is not entitled to relief the Court shall grant a prompt hearing and determine the issues and make findings of fact and conclusions of law.   **28 U.S.C. § 2255.** Dismissal of a 2255 motion without a hearing is inappropriate for claims involving off-the-record interactions with trial counsel. **Chang v. United States, 250 F.3d 79, 85 (2nd Cir. 2001).**   In Rawlins' case his claims all involve conversations and interactions with Braun that are not a part of the record.   Counsel Braun submitted an affidavit refuting some of Rawlins' allegations placing the material facts in dispute.   A Court should usually hold a hearing if material facts are in dispute.   **Puglisi v. United States, 586 F.3d 209, 213 (2nd Cir. 2009).**   To warrant a hearing, a defendant need establish

only that he has a plausible claim. **Raysor v. United States, 647 F.3d 491, 494 (2nd Cir. 2011).** Rawlins is a pro se petitioner. The Second Circuit has held that this should be considered when deciding whether to grant a hearing in order to avoid unfair results which might occur. **Pham v. United States, 317 F.3d 178, 187 (2nd Cir. 2003).** Rawlins' claims involve ineffective assistance of Counsel which ordinarily requires a hearing. **Armienti v. United States, 234 F.3d 820, 825 (2nd Cir. 2000).**

There are material facts that must be resolved with a hearing, to wit: (1) Was Braun conflicted by his acquisition of Core Choice stock; (2) Did this prejudice Rawlins; (3) Would the jury have still convicted Rawlins if it had known of the stock acquisition; (4) Was Rawlins prejudiced by Braun's failure to advise this Court of the stock acquisition; (5) Was there an implied waiver by Rawlins given that there was no evidence the waiver was knowing and intelligent; (6) Would this Court's opinion of Rawlins' credibility been different had it known of Braun's stock acquisition; (7) Did Braun's failure to submit the written proffer prejudice Rawlins; (8) Did Rawlins provide the Corporate Resolutions to Braun prior to trial; (9) Was Rawlins prejudiced by Braun's failure to present the resolutions to the jury; and (10) Was Rawlins prejudiced by Braun's failure to confront Sharp with evidence that he lied about not acquiring Applied Metrics; he lied about not providing false documentation to secure a loan; and he lied about not using Rawlins' Sports Suites for entertaining his clients and family. There are serious questions regarding the representation Braun provided and the resultant prejudice. Rawlins is entitled to an evidentiary hearing, and an opportunity to prove his allegations.

## G R O U N D   1

**COUNSEL RENDERED INEFFECTIVE ASSISTANCE AND VIOLATED RAWLINS' RIGHT TO DUE PROCESS WHEN COUNSEL DEVELOPED A CONFLICT OF INTEREST BEFORE TRIAL THAT ADVERSELY AFFECTED HIS REPRESENTATION OF RAWLINS.**

**Summary of Ground 1.**  Prior to trial, Counsel Braun acquired Rawlins' 10% interest in Core Choice, a company owned by Brian Sharp, the Government's key witness.  Rawlins alleged this created a conflict of interest that adversely affected Braun's representation of him. Before trial, Braun and Rawlins had decided their trial strategy would be to launch a vigorous attack on Sharp's credibility.  But after Braun's acquisition of the Core Choice stock, Braun failed to confront Sharp on numerous occasions when Sharp lied under oath and Braun had in his possession evidence of Sharp's lies but failed to use it.

**Counsel's Affidavit.**  In Braun's affidavit he only asserts that he acquired the Core Choice stock at the suggestion of Rawlins.

**Government's Response.**  The Government addressed this claim in Section II of its Response and presents the following arguments.

> (a) That Rawlins' claim lacks merit because Rawlins created the conflict, and implicitly waived it.

> (b) That even if an un-waived conflict existed, appointment of attorney Steven Brill cured it.

> (c) That Braun conducted a zealous attack on Sharp's credibility.

**Rawlins' Reply.**  Initially, the Government acknowledges that there is no case law which it can locate addressing the issue of a "defendant-created conflict."  Rawlins claims he did not create the conflict. Rawlins owed Braun substantial legal fees.  Braun was aware that Rawlins owned 10% of Core Choice, because he had copies of tax returns showing the ownership.  Braun told Rawlins he would take the stock to cover a

- 6 -

$25,000.00 returned check.  Rawlins agreed, and Braun prepared the assignment agreement which both parties signed.  Rawlins in no way "engineered and executed" the conflict as asserted by the Government. Braun was eager to acquire the stock, and threatened to withdraw as Rawlins' Counsel if Rawlins refuse to assign the stock to him.  The day after Braun acquired the stock, and contrary to Braun's promise not to withdraw from the case, Braun filed a Motion to Withdraw as Counsel, which this Court denied, even though Braun swore in an affidavit that the trust relationship between he and Rawlins was gone, and that he could not effectively represent Rawlins.

Braun knew that acquiring the stock of a company owned by the Government's key witness, a witness Braun would be cross-examining soon was a violation of the Rules of Professional Conduct.  Braun knew as an Officer of the Court that his failure to advise the Court of the stock acquisition was a breach of duty.  On the other hand, Rawlins did not know at the time that Braun's acquisition of the stock created a conflict of interest.  Without such knowledge, there could not have been an implied waiver of the conflict by Rawlins.

A defendant has a constitutional right to conflict-free representation.  **Holloway v. Arkansas, 435 U.S. 475 (1978).** However, this right may be waived.  A waiver of a constitutional right must be voluntary, knowing, and intelligent, and must be shown to have been done with awareness of its consequences.  **United States v. Morgan, 51 F.3d 1105, 1110 (2nd Cir. 1995).**  The law can presume that an individual who, with full understanding of his or her rights, acts in a manner inconsistent with their exercise, has made a deliberate choice to relinguish the protection those rights afford.

**Berghuis v. Thompkins, 130 S.Ct. 2250, 2260 (2010).** Waivers of constitutional rights are not favored by the Courts, and Courts indulge every reasonable presumption against the waiver, and do not presume acquiescence in the loss of fundamental rights. **Johnson v. Zerbst, 304 U.S. 458, 464 (1938).**

In other words, for a waiver to be implied, a party must have a full understanding of his rights, and there must be clear evidence by the party's decisive and unequivocal conduct of his intent to waive. And even then, the Court presumes against it. The only conduct exhibited by Rawlins regarding the conflict was to sign the Assignment Agreement prepared by Braun, and at Braun's insistence. Rawlins' conduct did not constitute an implied waiver. Furthermore, Braun never asserted that Rawlins "engineered and executed" the conflict. This was Government speculation. Braun only asserted that it was Rawlins who had "suggested" the assignment. But regardless of who suggested it, Braun was the only one who knew that it created a conflict, and knew it was srong. And Braun was the one who compounded this wrong by not advising the Court of the conflict, so that the Court could conduct an inquiry and ensure that Rawlins' constitutional rights were protected.

The Government argues that even if the conflict was not waived, it was cured by the appointment of attorney Steven Brill. The Government cites no case in the Second Circuit or the S.D.N.Y. that supports its argument that appointment of an additional attorney to a case cures a conflict of interest by the lead attorney. It does cite one unpublished case from the Fourth Circuit it claims supports its argument, but the case is vague regarding the conflict and provides

no details on the nature or extent of the conflict.

The Government claims that Brill "participated fully in the trial, during which he argued various motions, communicated with the Government, and examined several witnesses." The truth is that Brill did not argue any motions that Rawlins can recall, and any communications with the Government could not have affected the conflict since the Government was not aware of it, and Rawlins is unsure of whether Braun advised Brill of the conflict. If he did then Brill was also conflicted. And Brill only examined four low-level witnesses, and did not participate in either the opening or closing arguments.

There were several aspects of Rawlins' case where Brill might have made a difference had he fully participated in the trial as the Government claims. Brill could have assisted Braun in the preparation and submission of the written proffer showing the relevancy of the lies Sharp told to hide his extra-marital affair, but Brill did not. Brill could have presented to the jury, or ensured that Braun did, the Corporate Resolutions showing all cash transfers made by Rawlins, even those charged in Rawlins' Criminal Information, had been authorized, ratified, approved, and confirmed by Sharp, but Brill did not. Brill could have confronted Sharp, or ensured that Braun did, when Sharp provided false testimony about not having acquired Applied Metrics, or that he did not provide fraudulent financial information to Nathan Auslander to secure a loan, or that Rawlins did not own stock in Core Choice, or that Sharp did not use Rawlins' Sports Suites to entertain his family and clients, but Brill did not. Had Brill participated as fully in the trial as the Government claims,

Brill would have had knowledge of all of the above, and would have acted to ensure this critical evidence was presented to the jury, but Brill made no attempt to do this.

All of the claims made by Rawlins in this 2255 motion involve Braun and Sharp, to wit: Braun's acquisition of stock in a company owned by Sharp, Braun's failure to submit a written proffer regarding Sharp's affair, Braun's failure to admit the Corporate Resolutions executed by Sharp legitimizing all of Rawlins cash transfers, and Braun's failure to confront Sharp regarding the numerous lies he told during his testimony.  Brill had no interaction of any kind with Sharp during the trial.

The truth is Brill did only what Braun allowed him to do which was very little.  Brill's appointment had no effect on Braun's representation, or lack of representation, of Rawlins, and did not cure the adverse affect of Braun's conflict of interest.

The final argument presented by the Government is that Braun did launch a vigorous attack on Sharp's credibility proving the conflict did not affect his representation of Rawlins.  The so-called proof put forth by the Government was that Braun showed (1) that Rawlins performed some legitimate work; (2) that Sharp may have been biased because of a lawsuit Core Choice had against Capital Bank; (3) That Sharp transferred $3.2 million in stock to his wife as part of a divorce settlement; and (4) that two witnesses testified that it was their opinion that Sharp was not truthful. (Gov't Response, p. 18).

With all due respect, these examples the Government claims represents Braun's vigorous attack of Sharp's credibility are

laughable.  The first example that Braun showed that Rawlins had performed some legitimate work is not relevant to credibility. Rawlins worked with Sharp for eight years.  Obviously, he performed some legitimate work.  Rawlins was charged with making illegal cash transfers from companies owned by Sharp.  Braun had evidence in his possession showing that these cash transfers had been authorized, ratified, approved, and confirmed by Brian Sharp.  An effective attorney would have submitted this evidence to the jury, but Sharp failed to do this.

The second example that Braun showed Sharp might have been biased because of a lawsuit he had against Captial Bank only shows Sharp may have had a motive to lie.  It does not show that he actually lied.  Braun had evidence in his possession that Sharp actually lied when he said that he had not acquired Applied Metrics from Rawlins. Braun had in his possession evidence that Sharp lied when he testified that Rawlins did not own stock in Core Choice.  An effective attorney would have submitted this type of critical evidence instead of evidence about a possible bias.

The third example that Sharp transferred $3.2 million in stock to his wife in a divorce settlement proves nothing about Sharp's credibility.  An effective attorney would have prepared and submitted the written proffer requested by the Court showing how Sharp cheated on his wife then lied to her and everyone around him for over three years to hide the affair.

The last example that Braun had two witnesses who testified that it was their opinion that Sharp was untruthful proves little about credibility.  The witnesses presented no specific examples

of untruths told by Sharp.  Braun had available Nathan Auslander to testify.  A witness who would have provided numerous details of specific lies told by Sharp relating to a large financial transaction involving his company, Prime Health.  Auslander's testimony would have been far more compelling regarding Sharp's lack of credibility. For Sharp to present the witnesses he did instead of Auslander simply reinforces Rawlins' claim of Braun's ineffectiveness.

**Conclusion.**  The Government dismisses the whole conflict matter with a very cavalier attitude by portraying Braun as the innocent victim of an engineered plot by the villainous Steve Rawlins.  But the facts belie that characterization.  The undisputed facts are: (1) Before the trial, defense attorney Braun prepares and executes an Assignment Agreement acquiring 10% of Core Choice, a company owned by Brian Sharp, the Government's key witness against Rawlins; (2) During the trial, Braun limits his cross-examination of Sharp by not confronting him and exposing numerous false statements made by Sharp under oath with documentary evidence in Braun's possession; and (3) After the trial, Sharp pays off Braun for his interest in Core Choice, and both Sharp and Braun sign an agreement never to disclose their arrangement.

By any standard, this is improper, and raises serious questions that this Court should want to know, questions that go to the very heart and integrity of the judicial process.  It cannot be brushed aside by the Government with its "blame it all on Rawlins" position, a position that is inconsistent with the facts.  Rawlins reasserts his request for an evidentiary hearing and an opportunity to prove that Braun's conflict adversely affected his representation.

- 12 -

## G R O U N D   2

**COUNSEL RENDERED INEFFECTIVE ASSISTANCE WHEN HE FAILED TO SUBMIT A PROFFER REQUESTED BY THE COURT IN RESPONSE TO THE GOVERNMENT'S REQUEST FOR AN ORDER PROHIBITING RAWLINS FROM ELICITING EVIDENCE OR TESTIMONY REGARDING THE EXTRA-MARITAL AFFAIR OF THE GOVERNMENT'S KEY WITNESS.**

**Summary of Ground 2.**  The Court advised Braun to submit a written proffer in opposition to the Government's in limine motion to prohibit Rawlins from eliciting evidence or testimony regarding Brian Sharp's extra-marital affair, and the lies Sharp told his wife and others to hide the affair.  Counsel failed to submit the written proffer. Rawlins alleges that had Braun submitted the proffer citing available Second Circuit case law and requesting a limiting instruction there is a reasonable likelihood that the Court would have allowed the testimony of the lies told by Sharp, and had the jury heard the testimony there is a reasonable probability that it would have resulted in a different outcome.

**Counsel's Affidavit.**  Counsel claimed in his affidavit that he did not submit the written proffer because Rawlins kept changing the facts he believed could be proven.  This contradicted the reason he gave to the Court when this issue was discussed.

**Government's Response.**  The Government addressed this claim in Section III of its Response, and presented the following point in its argument.

> (a) That Sharp provided an oral proffer detailing several lies purportedly told regarding the affair.

**Rawlins' Reply.**  This Court made a preliminary finding granting the Government's in limine request to prohibit Rawlins from eliciting evidence or testimony of Sharp's affair and the lies he told to hide

- 13 -

it.  The Court advised Braun to submit a "written" proffer showing how evidence of the affair was relevant, and it would reconsider. Braun failed to do this.  Instead, Braun made an oral proffer stating that he believed the lies Sharp told his wife and others were relevant. This was the same argument Braun gave in an earlier statement which the Court had rejected.  Braun told the Court that the reason he did not submit the written proffer was because he believe the Court would not change its earlier finding.  He never stated that Rawlins kept changing the facts he believed could be proven.

Braun could have submitted a written proffer citing the Second Circuit case of **United States v. Amato, 540 F.3d 153, 165 (2nd Cir. 2008)**, which held that cross-examination of a witness about his extra-marital affair was permissible when the affair was recent in time. Sharp's affair was both contemporaneous to and connected to the charged offense.  Braun could have shown the Amato case was more applicable to his situation than **United States v. Siraf,** the case cited by the Government, which denied evidence of the witness' affair because it was remote in time, occurring 13 years prior to the charged offense.

Braun could also have requested a limiting instruction cautioning the jury to consider evidence of Sharp's affair and the lies he told to assess Sharp's credibility only, and not to allow their emotions to affect their assessment.  There is a strong presumption that juries follow instructions from the Court, thus, eliminating any possibility of prejudice to the Government's case.

However, Braun made no attempt to put forth to this Court what would have been a convincing written proffer.  Braun also lied to Rawlins when he told him that he had prepared the written proffer and

- 14 -

would be submitting it to the Court at the first opportune moment.
Rawlins alleged this in his affidavit, and Braun did not refute it.

Newly appointed Lawyer Steven Brill, who was appointed to ensure
that Braun's animosity towards Rawlins due to a fee dispute would not
spillover to affect Braun's representation of Rawlins, also failed to
submit the written proffer, or assist Braun in submitting it, even
though Brill was aware of its relevance and importance.

Supreme Court and Second Circuit case law clearly show that
Counsel has a duty to ensure that all relevant questions regarding a
witness' credibility is presented to the jury. "The jury, as finder
of fact and weigher of credibility, has historically been entitled to
assess all evidence which might bear on the accuracy and truth of a
witness' testimony." **United States v. Abel, 469 U.S. 45, 52 (1984).**
Even though the trial judge may impose reasonable limits on cross-
examination, a party whose prospective questioning is threatened with
curtailment should make all reasonable efforts to alert the Court to
the relevance and importance of the proposed questions. **Jones v.
Berry, 888 F.2d 670, 673 (2nd Cir. 1989); United States v. Whitten,
610 F.3d 168, 183 (2nd Cir. 2009).** Counsel Braun had a duty to make
all reasonable efforts to alert the Court to the relevance and the
importance of cross-examining the Government's key witness regarding
the deceit surrounding his extra-marital affair, but Braun failed to
do this when he failed to submit the proffer to the Court.

The Confrontation Clause guarantees a criminal defendant the
right to cross-examine a Government witness at trial. **U.S. Const.
Amend. VI.** "Cross-examination is the principle means by which the
believability of a witness and the truth of his testimony are tested."

**Davis v. Alaska, 415 U.S. 308, 316 (1974).**   This right is especially important when applied to the Government's key witness, or to a witness who provides an essential link in the Government's case. **United States v. Brown, U.S. Dist. LEXIS 14722 (2nd Cir. 2009).**   However, even though the trial court can impose reasonable limits on cross-examination, it should at all times be mindful that cross-examination is "the greatest legal engine ever invented for the discovery of truth." **Lilly v. Virginia, 527 U.S. 116, 124 (1999).**

Supreme Court and Second Circuit case law also show that prejudice can be cured with a limiting instruction and that Courts recognize a strong presumption that juries follow a trial Court's limiting instruction. **Zafiro v. United States, 506 U.S. 534, 540-41 (1993); United States v. Snype, 441 F.3d 119, 129 (2nd Cir. 2006).** This presumption "evaporates" only where there is an overwhelming probability that the jury will be unable to follow the Court's instruction. **United States v. Jones, 16 F.3d 487, 493 (2nd Cir. 1994).**   In Rawlins' case there was clearly not an overwhelming probability that had Braun submitted the proffer with a limiting instruction the jury could not have followed the instruction.

The New York district courts have been hesitant to grant in limine motions requesting that cross-examination in certain areas be prohibited unless it is clearly inadmissible.   Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds. **United States v. Paredes, 176 F.Supp. 2nd. 179, 181 (S.D.N.Y. 2001).**   The burden of proof that evidence is inadmissable for any purpose, and thus excludable on a motion in limine is on the movant. **United States v. Pugh, 162 F.Supp.**

3d. 97, 101 (E.D.N.Y. 2016). When the Government filed its in limine motion to prohibit testimony or evidence of Sharp's affair its only argument was that it might inflame the jury. This does not satisfy the standard for exclusion. Braun could have easily submitted the proffer with a limiting instruction and this Court would have denied the Government's motion.

**Conclusion.** When this Court made a preliminary ruling and advised Braun that it would reconsider that ruling upon submission of a written proffer, Braun knew that failure to submit the proffer would result in denying Rawlins the opportunity to present to the jury critical evidence. Attorney Brill also knew this and failed to step in and perform the duty for which he was appointed. Sharp lied not only to his wife, but to countless others, including employees, clients, bankers, and friends. Sharp's lies continued over a three year period, and involved hundreds, if not thousands of calculated deceptions. This Court was obviously open to reversing its earlier preliminary ruling upon receipt of a properly argued written proffer or it would not have advised Braun of such. The evidence Rawlins sought to admit went to the heart of Sharp's credibility, and the case law cited above shows that cannot be excluded except in extreme circumstances. Had Braun cited the Second Circuit case law and requested a limiting instruction, this Court would have allowed evidence of the lies Sharp told to hide his affair. Braun's failure to submit the written proffer and request the limiting instruction was ineffective representation, and Rawlins was prejudiced as a result of Braun's deficient performance.

## G R O U N D   3

**COUNSEL RENDERED INEFFECTIVE ASSISTANCE WHEN HE FAILED TO PRESENT EVIDENCE AT RAWLINS' TRIAL THAT WOULD HAVE SHOWN THE CASH TRANSFERS THAT BRIAN SHARP, THE GOVERNMENT'S KEY WITNESS, TESTIFIED WERE NOT AUTHORIZED AND WERE ILLEGAL HAD BEEN PREVIOUSLY DECLARED AUTHORIZED AND LEGAL IN WRITTEN DOCUMENTS EXECUTED BY BRIAN SHARP.**

**Summary of Ground 3.**  Rawlins alleged that he provided Braun with two Corporate Resolutions executed by Brian sharp, the Government's key witness, declaring that all cash transfers made from the Capital Bank, including those made by Rawlins that formed the basis of the Criminal Information, were authorized and legitimate.  Counsel advised Rawlins that the Corporate Resolutions would destroy Sharp's credibility and the Government's case, and that he would confront Sharp with them during cross-examination.  Counsel was ineffective when he failed to confront Sharp with the resolutions or to present them to the jury during the trial.

**Counsel's Affidavit.**  Counsel denied that Rawlins gave him copies of the Corporate Resolutions, and provided no additional details about these documents.

**Government's Response.**  The Government addressed this issue in Section IV of its Response, and presented the following points in its argument.

   (a) That Rawlins provided no independent evidence he presented the Corporate Resolutions to Counsel, and given Rawlins' history of false testimony, the Court should not believe him over the sworn assertions of experienced Counsel; and

   (b) That even if Rawlins had presented the Corporate Resolutions to Counsel it would not have changed the outcome since the resolutions did not cover misappropriated funds.

- 18 -

**Rawlins' Reply.**  Rawlins swore in his affidavit that he provided copies of the Corporate Resolutions to Braun, and Braun swore in his affidavit that Rawlins did not.  There is nothing in the record that adds support to either side, but it is more rational that Rawlins' assertion is true.  Rawlins was charged with making cash transfers that were not authorized from the Capital Bank accounts of Prime Health and Core Choice.  Brian Sharp, Prime's CEO and the Government's key witness, testified that the cash transfers were unauthorized.  However, Sharp had previously executed two Corporate Resolutions authorizing and legitimizing the same cash transfers he claimed at trial were not authorized.  Any evidence proving the transfers were authorized would have been critical to Rawlins' defense. It is not in dispute that Rawlins possessed copies of the Corporate Resolutions since he signed the January 12, 2013 resolution, and he was still working for Prime when the October 24, 2013 resolution was executed by Sharp.  Given that Rawlins had copies of the resolutions, it is more rational than not that he would have provided such critical evidence to Braun.

The Government's second point that the Corporate Resolutions would not have covered misappropriated funds is without merit.  The misappropriated funds were exactly what the Corporate Resolutions were intended to cover.  There would be no purpose in creating a Corporate Resolution to cover legitimate transfers.  When an individual in Rawlins' position might be using a company's banking facilities to commit a fraud, the bank runs a high risk of a negligence lawsuit by the company alleging bank liability for its failure to detect the fraud.  When the Capital Bank noticed that Rawlins was transferring

Prime Health and Core Choice funds to his personal and business accounts, primarily his American Express accounts, the bank alerted Brian Sharp of these transfers.  The Capital Bank then requested that Sharp execute the Corporate Resolutions authorizing all cash transfers made from Prime's account, including those made by Rawlins, and ratifying, approving, and confirming all prior cash transfers, including those made by Rawlins.  The bank included specific language in the Corporate Resolutions to fulfill their intended purpose of legitimizing all of Rawlins' cash transfers to his American Express accounts and other personal and business accounts.  These cash transfers were the exact same transfers charged in Rawlins' Criminal Information, and that Sharp later testified were not authorized and legitimate.  The Government is plainly wrong when it asserts that the Corporate Resolutions were not intended to cover misappropriated funds, when in fact, it was only these funds that the resolutions were intended to cover.

The Government further asserts that it is "nonsensical" to believe that Sharp would retroactively bless Rawlins' fraudulent scheme.  But that is exactly what Sharp did when he executed the Corporate Resolutions.  He may have been motivated by his desire to maintain his relationship with the bank who was his primary source of financing at the time, and who was pressing him to execute the resolutions.  But regardless of his motivation, Sharp elected to comply with the bank's request to retroactively authorize, ratify, approve, and confirm all financial transactions with the bank, including all of Rawlins' cash withdrawals, and Sharp did so with full knowledge of Rawlins' payments to American Express and others.

Sharp is an educated and experienced Corporate Executive.   Even though he changed his story later, most likely because of his $5.3 million civil suit against the Capital Bank, he would not have executed the Corporate Resolutions when he did without full knowledge of their legal effect, which was to legitimize all cash transfers made by Rawlins, including those listed in his Criminal Information.

Rawlins gave copies of the Corporate Resolutions to Braun, but even had Rawlins not given them to Braun, it does not alter the fact that Braun was ineffective.   Rawlins' defense, as both sides agree, was that Sharp authorized the cash transfers made by Rawlins.   Any competent attorney would know that there would be substantial documentation at both the corporate and banking levels defining the parameters of such authorization.   Any competent attorney would have requested copies to this authorizing documentation.   If Braun provided as vigorous of a defense that the Government asserts, and if newly appointed Brill was one of the best CJA lawyers in New York as the Government asserts, certainly one of them would have thought to ask Sharp, or the bank, to produce all documentation in their possession regarding Rawlins' authorization to make cash transfers at the Capital Bank.   Yet, neither Braun nor Brill made such a request. The most rational explanation for why Rawlins' defense did not request these authorizing documents is because they already had copies of the Corporate Resolutions, given to them by Rawlins.

Also, considering how thorough the S.D.N.Y. investigates financial crimes, the Government certainly obtained copies of all documentation regarding Rawlins' authorization to make withdrawals from the bank accounts of Prime Health and Core Choice, which means

the Government had copies of the Corporate Resolutions.  But the Government elected not to admit them at trial, or provide copies to Rawlins before the trial.  The reason is the Government knew it would harm their case, a strong testament that presentation of the Corporate Resolutions would have changed the outcome of Rawlins' trial.

Finally, it does not matter what the Government speculates about the resolutions.  All that matters is what the jury would have believed had they viewed them.  It is their domain alone to judge the evidence, but in this case, the jury never had an opportunity to judge the most critical evidence Braun had in his possession.  It is not difficult to imagine how the jury would have judged this evidence, after hearing Sharp testify for hours that Rawlins was not authorized to make the cash transfers, then viewing official bank documents executed by Sharp not only authorizing them, but ratifying, approving, and confirming them.  The impact would have been powerful.

**Conclusion.**  This is a case of conflicting affidavits, requiring an evidentiary hearing to determine whether Rawlins provided copies of the Corporate Resolutions to Braun.  As stated above, it is undisputed that Rawlins had copies of the resolutions, and it would not have been rational for him not to provide such critical evidence to defense Counsel.  In fact, with the exception of the Judge and jury, every principal party to this case, including Braun, Brill, Sharp, and the Government had copies of this compelling evidence.  The Court now has the resolutions, and can make its own assessment what value they would have brought to Rawlins' case, and whether Braun was ineffective when he failed to present the Corporate Resolutions to the jury.

## G R O U N D   4

**COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO PRESENT EVIDENCE IN HIS POSSESSION THAT WOULD HAVE SHOWN THAT THE GOVERNMENT'S KEY WITNESS LIED ON NUMEROUS OCCASIONS WHEN HE TESTIFIED AT RAWLINS' TRIAL.**

**Summary of Ground 4.** Rawlins claimed that the Government's key witness, Brian Sharp, lied on numerous occasions during his testimony, and Braun had evidence in his possession that would have exposed these lies, but failed to confront Sharp with it. Three of these lies were: (1) That Sharp said he did not acquire Applied Metrics; (2) That Sharp testified that Rawlins submitted false information when applying for an accounts receivable loan, when Sharp had submitted it; and (3) That Sharp testified he never used Rawlins' Sports Suites to entertain his family and clients of Prime Health and Core Choice, when he used it on a regular basis.

**Counsel's Affidavit.** Braun does not refute Rawlins' allegations that he possessed evidence during the trial that he could have confronted Sharp with that would have exposed his lies to the jury.

**Government's Response.** The Government addressed this claim in Section V of its Response, and presented the following points in its agrument.

> (a) As to Applied Metrics, the Government argues that Sharp's memory of the acquisition was not clear, suggesting there was no intent to deceive the jury.

> (b) As to submitting false financial information to secure a loan, the Government argues that Rawlins "generated" the false information that Sharp submitted, and corrected the information when he discovered it was false.

> (c) As to Sharp's lying about not using Rawlins' Sports Suites to entertain his clients, the Government argues that use of the suites was of little importance, and the affidavits Rawlins submitted were self-serving.

- 23 -

**Rawlins' Reply.**  The Government's argument that Sharp's memory was faulty is a deliberate fabrication of Sharp's testimony.  There is no evidence in the record that Sharp claimed this or even suggested it.  Sharp clearly stated that Prime Health considered acquiring Applied Metrics, but the acquisition was never completed.  Braun had documentary evidence that Prime Health purchased Applied Metrics from Rawlins, but Braun never presented the evidence to the jury.  The purchase price was $3 million.  Sharp denied the acquisition to avoid explaining the amount paid and the method of payment.  Shortly after the acquisition, Rawlins began the cash transfers from the Prime Health account to his American Express accounts.  Many of these cash transfers were legitimate payments for the money owed Rawlins from the purchase of Applied Metrics.  Had Sharp acknowledged the acquisition, he would have been faced with additional questions that would have led to him contradicting his earlier testimony, harm to the Government's case, and harm to his $5.3 million civil suit against the Capital Bank.

The Government's argument that Rawlins "generated" the false information that Sharp submitted to Nathan Auslander for an accounts receivable loan is also a deliberate fabrication.  Sharp never testified to this at trial.  Sharp specifically testified that it was Rawlins that had provided the inflated values for Prime Health's accounts receivables loan directly to Nathan Auslander. This was an absolute lie, and Sharp knew he was lying went he made the statement.  Nathan Auslander submitted an affidavit that asserts not only that he received the false information directly from Sharp, but also that Sharp told him that the bank had not called his loan, when in fact,

the bank had called it, and that Sharp did not tell him that a large portion of the receivables were from Core Choice, a related compamy. Auslander asserts also that Sharp directed him not to discuss the loan request with Rawlins, or anyone else at Prime, and to only discuss it with him, Sharp.   Contrary to the Government's assertions, Sharp only submitted the corrected accounts receivables information after Auslander discovered that the information Sharp had previously submitted was false.   Auslander further asserts that it was Rawlins that ultimately advised him of Sharp's deceptive conduct.   After Sharp completed his testimony regarding the loan request, Rawlins told Braun that Auslander would come to the trial and testify that it was Sharp who had committed the lies and submitted the false information to Auslander.   Braun told Rawlins that he would contact Auslander, issue him a subpoena, and have him at the trial to testify during Rawlins' defense, but Braun failed to do this.

The Government next argues that it is of little importance who used Rawlins' Sports Suites, and that the affidavits Rawlins submitted were self-serving.   The Government may be correct that use of these Sports Suites is not that important, but that only shows the depth of Sharp's deceptions.   The fact that he would even lie about this, and also that he would tell his clients and friends that the suites belong to him reveals a corrupt mentality, and a total disregard for the truth.   After Sharp's testimony regarding this issue, Rawlins told Braun that he had two individuals who would testify that Sharp had lied about the use of suites.   Braun told Rawlins that he would contact these individuals and have them there to testify, but Braun did not do this.

- 25 -

**Conclusion**.  At trial, this case was all about credibility, Brian Sharp's and Steven Rawlins'.  The jury elected to believe Sharp over Rawlins, and the Court made the same election which it articulated clearly at sentencing.  The issue is now about whether the jury would have reached the conclusion it did had it been exposed to the evidence of false statements made by Sharp during his testimony.  Had the jury had the opportunity to observe Sharp's reaction while being confronted with evidence that he lied about the acquisition of Applied Metrics, or Sharp's attempt to secure a loan with fraudulent documentation. Even Sharp's deception about the Sports Suites.  The jury might wonder why anyone would lie about that.

The Government's attempt to explain the false statements of its key witness turned them into fabricators of the facts.  Its explanation - Sharp just forgot that he spent $3 million to buy Applied Metrics from Rawlins.  Not likely.  Or, Rawlins gave him the fraudulent documents that he submitted for the loan.  That is not what Nathan Auslander said in his affidavit.  He said Sharp lied about every aspect of the loan, and told him not to speak to anyone, especially Rawlins about it.  Or, as the Government said about the Sports Suites, who cares about them anyway.  Well, obviously Sharp cared enough about them to lie about it.

Sharp's lucky Rawlins had such a bad lawyer.  A good one would have not only exposed the jury to Sharp's lies, but would have submitted a well drafted proffer, and the jury would have heard about the affair Sharp carried on for over three years with an employee who worked along side his wife at Prime Health during the entire time.  What kind of person could do that?  One very adept at lying.

<u>G R O U N D   5</u>

**COUNSEL WAS DENIED HIS RIGHT TO DUE PROCESS AT SENTENCING WHEN HE WAS DEPRIVED OF HIS PROPERTY WHEN HIS RESTITUTION AND FORFEITURE AMOUNTS WERE BASED ON UNCHARGED CONDUCT.**

<u>**Summary of Ground 5.**</u>  Rawlins was charged and convicted of one count of wire fraud for making illegal cash transfers from the bank accounts of Prime Health and Core Choice.  None of the cash transfers were charged as separate counts.  At sentencing, Rawlins' restitution and forfeiture amounts were based entirely on conduct that was never charged, or never specifically identified in the Criminal Information.  Rawlins contends he must be presumed innocent of all uncharged conduct and cannot be punished by depriving him of his property.

<u>**Counsel's Affidavit.**</u>  There was no affidavit submitted by Counsel regarding this issue.

<u>**Government's Response.**</u>  The Government addressed this claim in Section VI of its Response and presents the following argument.

> (a) The Government argues, "Rawlins cites no authority-nor could he-for the proposition that when transactions are not charged in separate counts of an Information, a defendant has never been charged with or convicted of such cash transfers."

<u>**Rawlins' Reply.**</u>  The Supreme Court held in **Nelson v. Colorado, 137 S.Ct. 1249 (2017)** that if a case is reversed on appeal then presumption of innocence is restored and any amount the defendant paid in restitution must be returned to him.  Rawlins is applying the logic of Nelson to his situation and asserting that he is presumed innocent of uncharged conduct, and if he is presumed innocent, he cannot be deprived of his property for any conduct not contained in the Information.  In other

words, if a defendant is presumed innocent upon reversal of his conviction, then it follows that he is innocent of charges for which he was never convicted regardless of whether the non-convictions are the result of a failure to charge outright.  If Rawlins may not be penalized for uncharged conduct, then that entails that any facts that could constitute elements of a separate offense from the offense conviction, may not be considered for purposes of sentencing.  This is so if the presumption of innocence is to be given weight.  The Government may not engage in an end-run around the Constitution by characterizing at sentencing uncharged facts that are actually elements of a separate offense as mere sentencing factors.  To do so eviscerates the presumption of innocence.

**Conclusion.**  At trial, the Government admitted thousands of credit card bills it claimed were paid with illegal cash transfers.  Yet, Rawlins was charged with only one of these, and once convicted, his guideline range was based on a loss amount as if he was convicted of all of them.  His restitution and forfeiture amounts were also based on all of the uncharged transfers.  The Government was never required to prove each element of each offense beyond a reasonable doubt, and Rawlins was deprived of his right to have a jury decide that for which he was guilty and that for which he was not.  This Court has the power and authority to base Rawlins' restitution and forfeiture amounts only on the count for which the jury convicted him.  Rawlins is requesting that this Court reconsider its findings as to restitution and forfeiture, and to modify its findings accordingly.

## CUMULATIVE UNFAIRNESS DOCTRINE

The Cumulative Unfairness Doctrine is firmly embedded in this Circuit's precedents. **United States v. Guglielmini, 384 F.2d 602, 607 (2nd Cir. 1967),** holding that even though not any one of the errors would have required reversal, the total effect of the errors casts such a serious doubt on the fairness of the trial that the conviction must be reversed. Also, **Chambers v. Mississippi, 410 U.S. 284, 302 (1973),** concluding that the exclusion of critical evidence, coupled with the refusal to permit the defendant to cross-examine a witness denied the defendant a fair trial. These cases refer to errors attributed to the trial Court, which of course, is not the situation here. Rawlins' 2255 motion refers to errors committed by defense Counsel, but the Doctrine still applies, because the result is the same in both cases - the denial of a fair trial.

From the beginning of the trial, Braun was conflicted. The extent of the conflict is difficult to discern without a hearing where Braun can testify under oath. But the fact remains he owned stock in one of the companies that Rawlins was accused of defrauding, and which was owned by the Government's key witness, Brian Sharp, a witness Braun would be cross-examining.

Second, Braun failed to submit a written proffer in opposition to the Government's in limine motion, which most likely Braun would have prevailed on, allowing Rawlins to cross-examine Brian Sharp regarding the hundreds, if not thousands, of lies and carefully crafted deceptions Sharp told in order to conceal an extra-marital affair he was having with an employee for over three years, and who worked along side Sharp's wife during the entire time.

Third, Braun failed to submit to the jury the most critical evidence in his possession, the Corporate Resolutions executed by Brian Sharp authorizing, ratifying, approving, and confirming all cash transfers made by Rawlins, including those contained in the Government's Criminal Information. Even though the Government claimed the Corporate Resolutions did not apply to misappropriated funds, Rawlins still had the right to have them presented to the jury, so that the jury, not the Government, could make the assessment as to whether they apply to misappropriated funds.

Fourth, Braun failed to confront Sharp with documentary and testimonial evidence in his possession showing Sharp lied on numerous occasions during his trial testimony while under oath. Rawlins claims that any one of these errors represents ineffective assistance of Counsel, and certainly the cumulative effect of them all does.

The Government suggests these errors by Braun were not errors, but strategic choices. But Braun does not assert in his affidavit that any decision he made was the result of strategic choice, and newly appointed Brill made no decisions, strategic or otherwise. In fact, these were not even choices. Braun and Rawlins had decided that their theory of defense was an attack on Sharp's credibility. Braun's decision to buy the stock, or not to submit the proffer to the Court, or not to present the Corporate Resolutions to the jury, or not to confront Sharp about his lies, were not choices, these were simply failures to vigorously pursue the defense theory, most likely due to Sharp's conflict, or his anger at Rawlins because of the fee dispute, or just plain incompetence.

## CONCLUSION

Braun was highly conflicted, and his representation reflected this. At the start of the trial, Braun had acquired 10% of Core Choice, a company owned by Brian Sharp, the Government's key witness. Braun was unsure of the stock's value, but he knew at some point after the trial, he would have to deal with Sharp regarding the stock. During Braun's cross-examination of Sharp, Braun had no way of knowing what these dealings would entail, but it would have had to have influenced his questioning of Sharp.

At the same time, Rawlins owed Braun over $150,000.00 in legal bills, and the last check Rawlins wrote Braun was returned unpaid. Braun was incurring more expenses each day the trial continued, and the only compensation he had received, and the only prospect for recovering any expenses was from the Core Choice stock. Given these facts, it is clear that a divergence occurred between Rawlins' interest and Braun's interest with respect to a course of action, that being Braun's failure to launch a vigorous attack on Sharp's credibility. This lapse of representation was a direct result of the conflict of interest and the anger Braun felt towards Rawlins.

As detailed in Rawlins' 2255 motion, Braun had numerous opportunities to attack Sharp's credibility, but failed to do so. Braun even stated in his affidavit that he could not effectively represent Rawlins. This Court noticed the friction, and appointed Brill, but as the record shows, Brill did very little during the trial, and nothing with regards to Sharp. Rawlins was denied his right to effective assistance of Counsel, and is entitled to an evidentiary hearing to prove this.

**Wherefore,** Rawlins requests this Honorable Court to GRANT his Motion pursuant to 28 U.S.C. § 2255, and Vacate his Judgment of Conviction, or in the Alternative, to GRANT him an Evidentiary Hearing and an Opportunity to Prove his Allegations, and whatever additional relief this Court deems appropriate.


Date:   __October 23, 2019__                Respectfully submitted,

                                            Steven Rawlins
                                            Reg. No. 22715-075
                                            SPC Memphis
                                            P.O. Box 2000
                                            Millington, TN 38083


## CERTIFICATE OF SERVICE

I, the undersigned, certify that a true and correct copy of the foregoing was placed in the Prison Mail System at SPC Memphis on this 23rd day of October, 2019, with sufficient prepaid first-class postage affixed, and addressed to the United States Attorney's Office, One St. Andrew's Plaza, New York, NY 10007.

                                            Steven Rawlins


- 32 -



Steven Rawlins
Reg. No. 22715-075
Federal Prison Camp
P.O. Box 2000
Millington, TN 10007

"L E G A L   M A I L"

UNITED STATES
POSTAL SERVICE

1000

10007

$0.00

U.S. POSTAGE PAID
FCM LG ENV
MILLINGTON, TN
3865
OCT 25, 19
AMOUNT
R2304E105993-06

CERTIFIED MAIL™

7011 0470 0002 1284 4065

Pro Se
SM

Office of the Clerk
United States District Court
500 Pearl Street, Room 120
New York, NY 10007-1312

MILLINGTON TN 38

OCT 25 2019

USPS

RECEIVED
SDNY PRO SE OFFICE
2019 NOV -1 AM 8:19
S.D. OF N.Y.

RECEIVED OFFICE
SDNY PRO SE OFFICE
2019 OCT 31 AM 7:55
S.D. OF N.Y.

CLERK'S OFFICE
S.D.N.Y.
2019 OCT 29 PM 2:05